UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and CENDANT CORPORATION, *n/k/a Avis Budget Group, Inc.,* | : | CIVIL ACTION NO. 3:08-CV-00933 (JBA) |
| Plaintiffs, | : | |
| v. | : | |
| WALTER A. FORBES, ROBERT T. TUCKER as TRUSTEE of the FORBES FAMILY TRUST, ROBERT T. TUCKER, individually, BUCK, STURMER & CO. P.C., CAREN FORBES, LAURA CARLIN, ALLISON FORBES, JOHN DOE TRUSTEE OF THE JOHN DOE TRUST, FG ENTERPRISES LLC, and the WISCONSIN TRUST MANAGER, LLC, as SUBSTITUTE TRUSTEE of the FORBES FAMILY TRUST, | : | |
| Defendants. | : | JANUARY 14, 2010 |

**UNITED STATES OF AMERICA'S**
**LOCAL RULE 56(a)1 STATEMENT**

Pursuant to D. Conn. L. Civ. R. 56(a)1, Plaintiff the United States of America contends that there are no genuine issues to be tried with respect to the following material facts, and hereby submits this statement in support of its Motion for Summary Judgment.

A. Background[1]

1. Between 1983 and 1997, Walter A. Forbes served as Chairman and CEO of CUC International, Inc. ("CUC") and its predecessor. (Third Amend. Jt. Compl. (hereinafter "Compl."), Dkt. 237, ¶ 20.)

2. In December 1997, CUC merged with HFS Incorporated to form Cendant Corporation. (Id.)

3. During Mr. Forbes' tenure as CEO of CUC, employees in CUC's accounting department engaged in a conspiracy to fraudulently inflate CUC's operating income (the "Fraud"). (Id. ¶ 22.)

4. On April 15, 1998, Cendant Corporation announced the discovery of the Fraud which, at that time, was the largest accounting scandal in United States history. (Id. ¶ 24.)

5. One day following Cendant's announcement, April 16, 1998, Cendant's share price dropped 46% on the New York Stock Exchange, and Cendant shareholders lost approximately $14 billion in share value. (Id. ¶ 25.)

6. Beginning on April 16, 1998, an avalanche of shareholders' lawsuits ("Shareholders Suits") began to be filed throughout the United States, many naming Mr. Forbes as a defendant. (Id. ¶ 26.)

7. On December 7, 1999, Cendant publicly disclosed that it had reached an agreement in principle to settle the bulk of the Shareholder Suits. (Id. ¶ 37.)

---

[1] Pursuant to Fed. R. Evid. 201, the Government asks the Court to take judicial notice of the following background facts that are clearly established on the criminal record and are not subject to reasonable dispute. See Cendant Corp. v. Shelton, 473 F. Supp. 2d 307 (D. Conn. 2007); Cendant Corp. v. Shelton, 474 F. Supp. 2d 377 (D.Conn. 2007); see also Judge Nevas' Ruling on Pretrial Motions, United States v. Forbes, 3:02CR264 (AHN), Dkt. 2466.

8. On February 28, 2001, a grand jury sitting in the District of New Jersey handed down an indictment against Mr. Forbes and E. Kirk Shelton, Mr. Forbes' co-defendant and the former President of CUC. (See United States v. Walter A. Forbes et al., 2:01CR00140 (WHW) (District of New Jersey), Dkt. 1.)[2]

9. Between 2004 and 2006, Mr. Forbes was tried three times in the United States District Court, District of Connecticut. (Compl. ¶¶ 44, 45; See generally United States v. Walter A. Forbes et al., 3:02CR264 (AWT) (hereinafter "Criminal Case").)

10. The first two trials resulted in hung juries. (See Criminal Case, Dkt. 1426; Declaration of Mistrial dated February 9, 2006.)

11. In the third trial, the jury convicted Mr. Forbes on three of the four counts of the operative indictment. (Criminal Case, Dkt. 2576.)

12. Judge Nevas sentenced Mr. Forbes to 151 months incarceration and imposed on Mr. Forbes a restitution order in the amount of $3.275 billion.[3] (Judgment and Restitution Order, attached as Exhibit A.)

B. Walter Forbes Goes Into Fraudulent Transfer Mode

13. On April 24, 1998, nine days after Cendant's announcement of the Fraud, Mr. Forbes' friend and personal attorney, Robert Tucker, called Mr. Forbes' Trust and Estates attorney Arthur Potts Jr. and asked him to put together what would

---

[2] The criminal case against Mr. Forbes and Mr. Shelton was initiated in the District of New Jersey and transferred to the District of Connecticut on September 11, 2002.

[3] A restitution order in the identical amount was imposed on Mr. Shelton by Judge Thompson following Mr. Shelton's conviction in the first trial. Mr. Forbes' and Mr. Shelton's liability under the restitution order is joint and several.

become known as the Forbes Family Trust. (Deposition of Arthur Potts, Jr. 81:2-11, May 5, 2009, excerpts attached as Exhibit B.)

14. Attorney Potts testified with respect to Mr. Forbes' intent relative to the Forbes Family Trust that "we were all at that point aware of the fact that the lawsuits had started . . . [a]nd I think Walter clearly wanted these properties to be in the hands of his children." (Id. at 81:14-18)

15. Mr. Potts further testified that "Walter wanted to get this accomplished for his children. I don't think he wanted the property to get drawn into any litigation that might ensue." (Id. at 145:17 – 147:7)

16. On June 8, 1998, the Forbes Family Trust was finalized and Mr. Forbes transferred into it, among other things, a large family estate located in Wisconsin that he had inherited with his brother in 1993, and had been in his family for over one hundred years. (See Deposition of Walter A. Forbes 144:7 – 145:20 125:18 – 126:3, February 4, 2009 , excerpts attached as Exhibit C.)[4]

17. Between 1998 and 2000, Mr. Forbes spent several million dollars renovating and maintaining the Wisconsin property that had been transferred into the Forbes Family Trust although, nominally, he no longer owned it. (See Memo from Robert T. Tucker to Michael J. Milliken, dated January 3, 2001, attached as Exhibit D; Forbes Dep., Exhibit C, 157:1 - 160:25.)

18. Robert Tucker, Mr. Forbes' long-time attorney and friend, noted that "[i]n a perfect world, these amounts would have been lent to the Trust which would

---

[4] This deposition was taken in the criminal action.

have expended the monies. In fact, Walter or Caren [his wife] paid invoices directly on behalf of the Trust." (Exhibit D.)

19. To account for the money spent on the trust's behalf, the trust executed promissory notes in the amount of approximately $2.8 million in favor of Mr. Forbes and secured payment with mortgages on the trust property. (See id.)

20. By Memorandum dated March 26, 2001, Robert Tucker advised Michael Milliken, Mr. Forbes' lawyer in Wisconsin, that the notes and mortgages needed to be transferred out of Mr. Forbes' name:

> Walter pointed out that I had overlooked one important factor concerning the Notes and Mortgages. Although certain of the funds came from Walter, he had immediately gifted the Promissory Notes and related Mortgages to Caren; therefore, all of the Notes and Mortgages should be in her name. Please redo each of the Notes and Mortgages which are in Walter's name so that they are to Caren and forward them to me for signature.

(Memo from Robert T. Tucker to Michael Milliken, dated March 26, 2001, attached as Exhibit E.)

21. On the same day the Forbes Family Trust was executed, June 8, 1998, Mr. Forbes transferred his interest in property located in Vail, Colorado to his then wife, Caren Forbes, for the nominal consideration of $10.00. (See Forbes Dep., Exhibit C, 80:8 – 82:9.)

22. Mrs. Forbes subsequently sold the Vail property for $13.5 million. (Deposition of Caren Forbes 54:3-25, June 5, 2009, excerpts attached as Exhibit F.)

23. On December 4, 1998, Mr. Forbes transferred his property interest and golf club membership located in Vero Beach, Florida to Mrs. Forbes, also for the nominal consideration of $10.00. (Forbes Dep., Exhibit C, 73:17 – 77:1.)

24. On December 15, 1999, Mr. Forbes transferred his interest in the Forbes family home, located in New Canaan, Connecticut, to Mrs. Forbes for the nominal consideration of $10.00. (Forbes Dep., Exhibit C, 66:12 – 68:1.)

25. With respect to the New Canaan, Connecticut transfer, Mr. Forbes testified:

> Q. And why did you transfer your interest in the New Canaan property to your wife for $10.00?
>
> A. At the time I felt that it was going to be subject to a lot of civil suits. I thought it might provide some more protection to her and the kids, so I transferred it.
>
> . . .
>
> Q. When you said that you were concerned about potential civil liabilities earlier were you referring to securities litigation involving Cendant Corp. formerly known as CUC?
>
> A. There were class action suits and other things floating around in a general category.
>
> Q. Those were the securities litigation?
>
> A. I believe so.
>
> . . .
>
> Q. But you did have concern about civil liability from the Cendant shareholders suit; is that correct?
>
> A. Well, they cropped up instantly in ’98, so I was.

Q. You were aware of that?

A. I was. Sure.

Q. And you were concerned about that?

A. I was.

(Forbes Dep., Exhibit C, 68:16-20; 70:15-22; 72:4-10.)

26. His testimony was nearly identical with respect to the Vero Beach, Florida transfer:

Q. Have you ever owned any property in the State of Florida, Mr. Forbes?

A. Yes.

Q. Where is that located?

A. In Vero Beach.

. . .

Q. Do you still own that property?

A. No.

Q. Did you sell your interest in that property?

A. I transferred my interest to my wife.

. . .

Q. And, again, why did you do this transfer?

A. Exactly the same reasons I gave you for the prior transfer.

Q. And what is the date of this transfer, Mr. Forbes?

A. It would appear to be the 4th day of December 1998.

Q. And on December 4th, 1998, were you aware of the same civil liabilities that you discussed earlier?

A. I was.

Q. And was that a motivating factor for why you transferred your interest in this property to Mrs. Forbes?

A. It was.

Q. Did you have any other motivating factor for doing so?

A. No.

(Id. at 73:17-21; 74:15-18; 76:12 – 77:1.)

27. His testimony regarding the Vail, Colorado transfer was similar to his testimony regarding the Connecticut and Florida transfers:

Q. Have you ever owned any property in Colorado, Mr. Forbes?

A. Yes.

Q. Where?

A. Vail.

. . .

Q. Do you still own that property?

A. No.

Q. Who did you sell that property to?

A. I transferred my share to my wife.

Q. And did she give you any compensation for that?

A. My guess is $10.00, but I don't recall.

Q. Is that guess based on standard practice or for any other reason?

A. Because that's the price on the other two.

Q. Do you recall when that transfer took place?

A. Not specifically.

Q. Do you recall approximately?

A. I'm sure in the same time frame, around '98, '99.

Q. Do you recall why you transferred it?

A. Same reasons.

Q. And those reasons were the concern about the potential civil liabilities concerning the shareholder litigation?

A. That's correct.

(Id. at 80:8-12; 80:24 – 81:17.)

28. In addition to the real estate transfers, through wire transfers on July 29, 1998 and August 5, 1998, Mr. Forbes also transferred $14 million in cash into bank accounts in his wife's name. (See Wire Transfers, Exhibits G and H.)

29. On the same day as the $10 million transfer to his wife, July 29, 1998, Mr. Forbes also he transferred $150,000 to each of his four daughters. (See JP Morgan Bank Statement, Exhibit I, at BS10-00598; see also Joint Complaint dated June 19, 2008, Dkt. 1 ¶ 177; Answer and Affirmative Defenses by Defendants Laura Carlin and Alison Forbes dated October 14, 2008, Dkt. 87 ¶¶ 177) (hereinafter "Laura Carlin and Alison Forbes Answer").

30. In January 2000, he transferred another $4.4 million to Mrs. Forbes. (See Bank Statements, Exhibits J and K) (showing withdrawals of $2.5 million, $1.32 million, and $650 thousand from Mr. Forbes' bank accounts and deposits of the exact same amounts into Caren Forbes' bank accounts).

31. Mrs. Forbes claimed to have no knowledge of the $10 million cash transfer. (See Caren Forbes Dep., Exhibit F, 70:24 – 73:19.)

32. Between 1998 to 2003, Mr. Forbes also transferred hundreds of thousands of dollars in cash and valuable securities to his daughters for no consideration. (See Joint Compl., Dkt. 1 ¶¶ 177, 178; Laura Carlin and Alison Forbes Answer ¶¶ 177, 178.)

33. Between 2001 and 2006, Mr. Forbes also transferred over $200 thousand in cash to Robert Tucker, for no consideration. (See Amended Complaint, Dkt. 132 ¶ 304; Answer and Affirmative Defenses of Defendant Robert Tucker, Dkt. 193 ¶ 304.)

34. Prior to April 1998, Mr. Forbes had net assets exceeding $68 million. (See Walter Forbes Index of Asset Ownership dated December 31, 1998, attached as Exhibit L; see also Affidavit of Douglas Buck dated January 13, 2010, attached as Exhibit V, ¶ 7 and Exhibit 5 attached thereto.)

35. By 2003, his net assets had dwindled by nearly 75%, down to $17.2 million. (See Walter Forbes Financial Statement dated December 31, 2003, attached as Exhibit M; see also Affidavit of Douglas Buck, Exhibit Y, ¶ 8 and Exhibit 6 attached thereto.)

36. After the commencement of his trials, Mr. Forbes ran out of his own money to pay his lawyers, so he arranged for his wife to take a mortgage out on the New Canaan property that he had already fraudulently transferred to her in 1999. (See Caren Forbes Dep., Exhibit F, 86:6 - 25.)

37. By April 2006, Mr. Forbes stopped paying his lawyers altogether. (See Declaration of Robert M. Cary dated June 15, 2009, attached as Exhibit N, ¶ 3.) ("The last payment my firm received [from Mr. Forbes] was in April 2006, which only covered a fraction of the outstanding fees owed at that time.")

C. Facts Relevant to Claims Against Beth Freimour (Twenty-Third and Twenty-Fourth Counts)

38. After leaving Cendant in July 1998, Mr. Forbes began working fulltime at FG II Ventures, LLC ("FG II"), a venture capital firm he founded. (See Forbes Dep., Exhibit C, 36:16 – 37:1.)

39. Beth Freimour, who was Mr. Forbes' assistant at Cendant, left Cendant and joined FG II to work with Mr. Forbes in the same capacity. (Deposition of Beth Freimour 15:4 – 19:16, October 6, 2009, excerpts attached at Exhibit O.)

40. Ms. Freimour was employed by FG II from approximately August 1998 to December 2007 and was supervised by Mr. Forbes. (Id. at 15:4-7; 16:18-24; 18:14-16.)

41. Ms. Freimour had no contract of employment with either FG II or Cendant. (Id. at 17:6-8; 19:24 – 20:1.)

42. FG II did not publish an employee handbook or manual. (Id. at 17:9-10.)

43. FG II did not offer any employee benefit program for the provision of legal services. (Deposition of Frank Gallagi 129:22-25, November 24, 2009, excerpts attached as Exhibit P; Deposition of Rodd Evonsky 88:6-9, December 22, 2009, excerpts attached as Exhibit Q.)

44. While employed by Cendant and FG II, Ms. Freimour was questioned in connection with the criminal investigations relating to Mr. Forbes. (See Letter from Michael J. Jones to Jordan M. Anger, Francis J. Brady and Robert E. Kaelin dated April 14, 2009 (hereinafter "April 14, 2009 Letter"), attached as Exhibit R; Freimour Dep., Exhibit O, 114:2 – 115:15; 128:14 – 130:21.)

45. Ms. Freimour hired the law firm of Arent Fox Kintner Plotkin & Kahn, PLLC to represent her with respect to the investigation. (See e.g., Freimour Dep., Exhibit O, 129:3-5.; April 14, 2009 Letter, Exhibit R, at 1.)

46. Each month, Ms. Freimour paid her legal fees out of her own bank account, but was then reimbursed in the exact amount by Mr. Forbes. (See April 14, 2009 Letter, Exhibit R, FREIMOUR 001 – 080; Freimour Dep., Exhibit O, 130:12-16.)

47. As further indicated in the chart below, between November 11, 2000 and November 13, 2006, Ms. Freimour was given $107,081.84 by Mr. Forbes ostensibly for reimbursement of her legal expenses:

| DATE[5] | AMOUNT |
|---|---|
| 11/21/2000 | $10,000.00 |
| 5/9/2001 | $249.24 |
| 5/19/2003 | $850.00 |
| 7/1/2003 | $8,590.00 |
| 8/19/2003 | $1,200.00 |
| 9/11/2003 | $1,006.24 |
| 9/25/2003 | $5,325.00 |
| 10/17/2003 | $12,498.90 |
| 11/26/2003 | $8,011.25 |
| 1/30/2004 | $8,224.24 |
| 2/27/2004 | $8,351.60 |
| 4/13/2004 | $2,324.20 |
| 4/14/2004 | $3,099.96 |
| 1/28/2005 | $2,600.70 |
| 3/9/2005 | $3,800.00 |
| 4/20/2005 | $3,477.00 |
| 6/3/2005 | $2,075.00 |
| 7/14/2005 | $1,050.25 |
| 8/17/2005 | $935.25 |
| 9/30/2005 | $2,040.75 |
| 11/27/2005 | $3,175.42 |
| 12/19/2005 | $5,280.20 |
| 1/26/2006 | $3,401.24 |
| 2/24/2006 | $3,095.15 |
| 4/20/2006 | $1,850.25 |
| 6/14/2006 | $3,560.00 |
| 11/13/2006 | $1,010.00 |
| **TOTAL** | **$107,081.84** |

[5] The date column represents the dates the payments from Mr. Forbes were made to Ms. Freimour, not the date she was invoiced for legal services.

(See April 14, 2009 Letter, Exhibit R, FREIMOUR 001-080.)

48. The reimbursements came directly from Mr. Forbes. (See Forbes Dep., Exhibit C, 123:7 – 124:25.)

49. Mr. Forbes did not receive any consideration for these transfers and was not legally obligated to provide Ms. Freimour with legal representation. (See id. at 123:7 – 124:25.)

50. During the relevant time period, Rodd Evonsky was FG II's controller. (Evonsky Dep., Exhibit Q, 15:9-15.)

51. In that capacity, Mr. Evonsky handled the accounting books for FG II, including the disbursement of distributions from the various FG investments to the FG II clients in their pro rata shares. (See id. at 167:19 – 169-5.)

52. Mr. Evonsky was also responsible for monitoring all of the bank accounts for FG II and reconciling the accounts. (See id. at 89:5 – 90:5.)

53. Indeed, Mr. Evonsky referred to himself as the FG II "bookkeeper." (Id. at 15:12-15.)

54. With respect to his role in monitoring the bank accounts, Mr. Evonsky testified as follows:

> Q. Now, in your role as Controller, did you have any oversight or supervision with regard to the payment of expenses?
>
> A. Yes.
>
> Q. So, when checks were written that would be something you were aware of?

A. Yes.

Q. Were checks written to pay expenses or any other bills or anything else for FG II Ventures, LLC, that you were not aware of during your time as Controller?

A. Not that I recall.

Q. Would that be surprising to you that somehow bills were being paid or checks were written against FG II Ventures, LLC., bank accounts without your involvement or awareness?

A. Yeah, and I probably would've known just because reconciliation of bank accounts and things of that sort —-

Q. So, you would've —-

. . .

So, in other words if you looked at a bank account and saw that there was less money in it than the last time you looked, that would be something you would investigate?

A. Yes.

(Id. at 89:5 – 90:5.)

55. Accordingly, it was not possible for FG II to make a payment without Mr. Evonksy's knowledge. (Id.)

56. FG II made no payments to Ms. Friemour to reimburse her for her legal expenses. As Mr. Evonsky testified:

Q. If FG II Ventures were to pay any legal fees for any purpose, would that have been something that in your capacity as Controller, you would've been aware of?

A. Yeah.

Q. Were you aware that FG II Ventures paid legal fees for Ms. Freimour?

A. I don't believe it had.

Q. Or that it reimbursed Ms. Freimour for legal fees?

A. I don't believe it had. And I may be mistaken, but I don't believe it had.

(Id. at 114:5-15.)

D. Facts Relevant to Claims Against Frank Gallagi (Nineteenth and Twentieth Counts)

57. Mr. Gallagi began working at FG II in the summer of 1999. (Gallagi Dep., Exhibit P, 16:25 – 17:4.)

58. Mr. Forbes and Mr. Gallagi, along with the rest of the staff of FG II, were investment advisors whose jobs were to investigate and evaluate potential investments. (See Evonsky Dep., Exhibit Q, 103:21 – 105:25.).

59. FG II operated what was known as a "call fund" for high-net worth individual investors. (Gallagi Dep., Exhibit P, 23:14 – 24:13.)

60. The purpose of FG II was to find potential business opportunities and determine whether the opportunity represented a good investment. (Id.)

61. The business ventures that FG II considered would typically be illiquid investments that required FG II to invest a minimum amount of capital. (Id. at 34:15 – 38:25).

62. If, after thoroughly investigating the investment and engaging in due diligence, FG II determined it was a worthwhile investment, FG II would attempt to "fill

the order" for the minimum required capital investment by soliciting investments from its clients. (Id.)

63. Once FG II had collected enough capital to fill the order, it would form a limited liability company solely for the purpose of investing in the venture. (Id.)

64. The LLC was typically given an "FG" prefix.[6] (Id.)

65. For example, the FG Entity used to invest in Jamba Juice Co. was called FG - JJ. (Id. at 107:9.)

66. Mr. Forbes repeatedly referred to the FG Entities as "partnerships" during his deposition. (See e.g., .Forbes Dep., Exhibit C, 27:12-16; 42:10-13.)

67. All the members of FG II had ownership interests in some of the same investments. (See e.g., Gallagi Dep., Exhibit P, 39:1-3; Evonsky Dep., Exhibit Q, 23:7-25.)

68. Mr. Forbes, Mr. Gallagi, and Mr. Evonsky all had managerial responsibility over FG II. (See Evonsky Dep., Exhibit Q, 139:3-9.)

69. Any distributions made by the underlying business investment would be made to the LLC which, in turn, would distribute the funds to the individual investors in their pro rata shares. (Gallagi Dep., Exhibit P, 37:20 – 38:14.)

70. Mr. Forbes invested in a number of the FG Entities, both individually and through his personal investment vehicle, FG Enterprises LLC. (See August 17, 2001 Summary of Investor Undistributed Investments, attached as Exhibit S (showing

---

[6] Hereinafter, the LLC's created by FG II will be referred to collectively as the "FG Entities."

Mr. Forbes' ownership interest in the various FG II Entities); see also Forbes Dep., Exhibit C, 38:17 – 45-11; 61:12 – 62:7.)

71. Mr. Forbes has stipulated that FG Enterprises is single-member LLC in which he is the only member and that its assets "should be available as partial satisfaction of the Restitution Order." (See Stipulated Order Regarding Defendant FG Enterprises LLC, Dkt. 194 ¶ 2.)

72. At his deposition, Mr. Forbes conceded that FG Enterprises is simply "a piece of paper" and that any assets owned by FG Enterprises LLC would have been his. (See Forbes Dep., Exhibit C, 61:12 – 65:6.)

73. Through an Assignment and Assumption Agreement dated January 1, 2002, Mr. Forbes transferred all of his interests in the following FG Entities to Mr. Gallagi for one dollar: FG-CEI; FG-EC; FG-ECB; FG-SKY; FG-OCTV; FG-CAP; and FG-SWB. (Assignment and Assumption Agreement between Walter A. Forbes and Frank Gallagi dated January 1, 2002, attached as Exhibit T; see also Affidavit of Douglas Buck, Exhibit Y, ¶ 4 and Exhibit 2 attached thereto.)

74. Through a similar Assignment and Assumption Agreement also dated January 1, 2002, FG Enterprises LLC transferred all of its interests in the following FG Entities to Mr. Gallagi for one dollar: FG-CEID; FG-RAL; FG-ED; FG-IH; FG-JJ; FG-MH; FG-STWT; FG-CAP; FG-SB; FG-USG (Assignment and Assumption Agreement between FG Enterprises, LLC and Frank Gallagi dated January 1, 2002, attached as Exhibit U; see also Affidavit of Douglas Buck, Exhibit Y, ¶ 4 and Exhibit 1 attached thereto.)

75. No one at FG II conducted any due diligence to determine the actual value of the interests at the time of the transfer. (Evonsky Dep., Exhibit Q, 177:7-12.)

76. According to the Investor Summary created by Rodd Evonsky on or around August 17, 2001, the then current value of the investments transferred from Mr. Forbes to Mr. Gallagi was approximately $439,009 and the value of the investments transferred from FG Enterprises LLC to Mr. Gallagi was $698,406. (See Investor Summary, Exhibit S.)

77. Moreover, as summarized by the following chart, between 2003 and 2006, the transferred interests distributed $868,903.00 in cash and marketable securities to Mr. Gallagi.

| Entity | Distribution Amount |
|---|---|
| 2003 | |
| F.G. – EC | $51,006.00 |
| F.G. – ECB | $27,403.00 |
| F.G. – ED | $22,818.00 |
| F.G. – MH | $99,212.00 |
| 2004 | |
| F.G. – OCTV | $30,495.00 |
| 2005 | |
| F.G. – CEI | $73,718.00 |
| F.G. – CEID | $38,621.00 |
| 2006 | |
| F.G. – CEI | $11,927.00 |
| F.G. – CEID | $6,256.00 |
| F.G. – JJ | $151,156.00 |
| F.G. – RAL | $356,291.00 |
| **TOTAL** | **$868,903.00** |

(See Schedule K-1 Forms issued to Frank Gallagi for the FG Entity interests transferred by Mr. Forbes and FG Enterprises (hereinafter "K-1s"), attached as Exhibit V; see also Frank Gallagi's Responses to Cendant Corporation's Requests for Admissions (hereinafter "Gallagi RFA Responses") ¶¶ 7, 10, 13, 16, 22, 25, 28, 31, 34, 37, attached as Exhibit W)

78. The FG Entities transferred to Mr. Gallagi from Mr. Forbes and FG Enterprises were worth substantially more than the $2.00 Mr. Gallagi paid for them. (See id.; see also Investor Summary, Exhibit S.)

79. In addition, as proof that Mr. Forbes did not think these investments were worthless, in June 2003 (after the Assignment and Assumption Agreements were executed), he invested in shares of Milkhaus Laboratory Inc., the underlying investment in FG – MH, one of the FG Entities he transferred to Mr. Gallagi. (See Federal Money Transfer dated June 20, 2003, attached as Exhibit X; see also Investor Summary, Exhibit S (identifying Milkhaus Laboratory Inc. as the underlying investment for FG – MH).)

80. Mr. Gallagi admits that these transfers took place. (Gallagi RFA Responses, Exhibit W, ¶¶ 2, 4; see also Gallagi Dep., Exhibit P, 61:21 – 65:11; )

81. Mr. Evonsky testified that he signed the Assignment and Assumption Agreements as a witness. (Evonsky Dep., Exhibit Q, 26:15 – 28:23.)

82. As further evidence that Mr. Gallagi and Mr. Forbes knew that these assignment and assumption agreements were not honest, arms length transactions

at the time they were made, the agreements, while dated January 1, 2002, were substantially backdated. As Mr. Evonsky testified:

> Q. Okay. And this document is dated January 1st, 2002?
>
> A. That is correct.
>
> Q. Okay. And to your memory was that when this agreement was executed, on or about?
>
> A. Probably, a little bit later in the year.
>
> Q. Okay. It's dated January 1st, 2002, but it may be –-
>
> A. To be effective dated January 1st, 2002. Correct.
>
> Q. Okay. Do you know when this was executed then, on or about?
>
> A. Specifically, I do not recall but probably later in the year.
>
> Q. And what makes you think that?
>
> A. It's just typical before the year closes out investors might want to transfer their interests and it's always cleanest to do it at the beginning of a period as opposed to sometime in the middle of the period just because of the way partnership accounting typically works.
>
> Q. Okay. So, when do you think this would have been executed?
>
> A. Probably before –- well, before the year-end of 2002.
>
> Q. Okay. So, but closer to the end of that year?
>
> A. Most likely, yes.

(Evonsky Dep., Exhibit Q, 28:24 – 29:25.)

83. More importantly, the actual transfers did not occur until sometime in 2003. (See Affidavit of Douglas Buck, Exhibit Y ¶ 6 and Exhibit 4 attached thereto.)

84. As evidence that the transfers did not occur until after December 31, 2002, on February 18, 2003, Robert Tucker, Mr. Forbes' long-time friend and attorney, advised Douglas Buck, CPA, Mr. Forbes' accountant, that the decision whether or not to complete this transfer would be "decided [] by the time 10/03 return is filed. . . ." (See Exhibit 4 attached to Affidavit of Douglas Buck, Exhibit Y, at BS32-01370.)

85. Similarly, on February 18, 2003, Mr. Tucker advised Douglas Buck that Mr. Forbes' attorneys were considering whether the "sale of FG Entities to F. Gallagi for $1 [would have] any ramifications to suit" and therefore "that by the time (10/03) return 2002 is filed, they will advise if this should not be done." (Id. at BS32-01262.) Clearly, Mr. Forbes' attorneys were concerned that this was a fraudulent transfer that could have "ramifications" on the lawsuits Mr. Forbes was facing and whether or not this transaction was going to take place was still being considered.

86. Accordingly, it is clear that the transfers to Mr. Gallagi were not completed until after December 31, 2002. (See Affidavit of Douglas Buck, Exhibit Y, ¶¶ 5, 6, and Exhibits 3 and 4 attached thereto.)

PLAINTIFF –
UNITED STATES OF AMERICA

PAUL J. FISHMAN

Special Attorney
U.S. Attorney's Office, District of New Jersey

By: /s/ Jordan M. Anger
Jordan M. Anger – PHV02694
jordan.anger@usdoj.gov

Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Telephone: (973) 645-2829
Facsimile: (973) 297-2010