UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and CENDANT CORPORATION, *n/k/a Avis Budget Group, Inc.,* | : | CIVIL ACTION NO. 3:08-CV-00933 (JBA) |
| Plaintiffs, | : | |
| v. | : | |
| WALTER A. FORBES, ROBERT T. TUCKER as TRUSTEE of the FORBES FAMILY TRUST, ROBERT T. TUCKER, individually, BUCK, STURMER & CO. P.C., CAREN FORBES, LAURA CARLIN, ALLISON FORBES, JOHN DOE TRUSTEE OF THE JOHN DOE TRUST, FG ENTERPRISES LLC, and the WISCONSIN TRUST MANAGER, LLC, as SUBSTITUTE TRUSTEE of the FORBES FAMILY TRUST, | : | |
| Defendants. | : | JANUARY 14, 2010 |

**UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

On April 15, 1998, Walter A. Forbes began the process of transferring virtually all of his assets to his friends and family with the clear – and admitted – intent of evading his creditors. The impetus to engage in these fraudulent transfers was Cendant Corporation's public announcement of discovering that Mr. Forbes had orchestrated the largest accounting fraud in United States' history. At the time, Mr. Forbes was the Chairman of the newly formed Cendant Corporation. The scandal would force Mr. Forbes to resign from Cendant and would end with his conviction on

securities fraud charges and the imposition by United States District Judge Alan H. Nevas of a 151 month prison sentence and a $3.275 billion restitution order.

That restitution order, the basis of this civil litigation, remains almost wholly unsatisfied. By its Motion for Summary Judgment, the United States seeks to continue its efforts at enforcing Judge Nevas' order and further compensate the victims of Mr. Forbes' criminal activities.

Accordingly, the United States respectfully requests that the Court enter summary judgment, pursuant to Fed. R. Civ. P. 56, against defendant Frank Gallagi on the Nineteenth and Twentieth Counts and against defendant Beth Freimour on the Twenty-Third and Twenty-Fourth Counts of the Third Amended Joint Complaint as further articulated below.

A. Facts

1. Background

Between 1983 and 1997, Walter A. Forbes served as Chairman and CEO of CUC International, Inc. ("CUC") and its predecessor. (United States of America's Local Rule 56(a)1 Statement (hereinafter "56(a)1 Statement") ¶1.) In December 1997, CUC merged with HFS Incorporated to form Cendant Corporation. (Id. ¶2.) During Mr. Forbes' tenure as CEO of CUC, employees in CUC's accounting department engaged in a conspiracy to fraudulently inflate CUC's operating income (the "Fraud"). (Id. ¶3.) On October 31, 2006, a jury convicted Mr. Forbes for his role in the Fraud. (Id. ¶11.)

On April 15, 1998, Cendant Corporation announced the discovery of the Fraud which, at that time, was the largest accounting scandal in United States' history. (Id. ¶4.) One day following Cendant's announcement, April 16, 1998, Cendant's share price dropped 46% on the New York Stock Exchange, and Cendant shareholders lost approximately $14 billion in share value. (Id. ¶5.) Beginning on April 16, 1998, an avalanche of shareholders' lawsuits ("Shareholders Suits") began to be filed throughout the United States, many naming Mr. Forbes as a defendant. (Rule 56(a)1 Statement ¶6.) On December 7, 1999, Cendant publicly disclosed that it had reached an agreement in principle to settle the bulk of the Shareholder Suits. (Id. ¶7.)

On February 28, 2001, a grand jury sitting in the District of New Jersey handed down an indictment against Mr. Forbes and E. Kirk Shelton, Mr. Forbes' co-defendant and the former President of CUC. (Id. ¶8.)[1] Between 2004 and 2006, Mr. Forbes was tried three times in the United States District Court, District of Connecticut. (Id. ¶9.) The first two trials resulted in hung juries. (Id. ¶10.) In the third trial, the jury convicted Mr. Forbes on three of the four counts of the operative indictment. (Id. ¶11.) Judge Nevas sentenced Mr. Forbes to 151 months incarceration and imposed on Mr. Forbes a restitution order in the amount of $3.275 billion.[2] (Rule 56(a)1 Statement ¶12.)

[1] The criminal case against Mr. Forbes and Mr. Shelton was initiated in the District of New Jersey and transferred to the District of Connecticut on September 11, 2002.

[2] A restitution order in the identical amount was imposed on Mr. Shelton by Judge Thompson following Mr. Shelton's conviction in the first trial. Mr. Forbes' and Mr. Shelton's liability under the restitution order is joint and several.

2. Walter Forbes Goes Into Fraudulent Transfer Mode

Almost immediately after the Cendant announcement of the fraud on April 15, 1998, Mr. Forbes went into fraudulent transfer mode. According to Mr. Forbes' Trusts and Estates lawyer, Arthur Potts, Jr., Mr. Forbes created the Forbes Family Trust in an attempt to shield the trust property from his creditors. (See Id. ¶¶13 – 15.) Specifically, Mr. Potts testified that on April 24, 1998, Mr. Forbes' personal attorney, Robert Tucker, called Attorney Potts and asked him to put together what would become known as the Forbes Family Trust because "we were all at that point aware of the fact that the lawsuits had started . . . [a]nd I think Walter clearly wanted these properties to be in the hands of his children." (Id. ¶14); (see also id. ¶15 ("Walter wanted to get this accomplished for his children. I don't think he wanted the property to get drawn into any litigation that might ensue.")) On June 8, 1998, the Forbes Family Trust was finalized and Mr. Forbes transferred into it, among other things, a large family estate located in Wisconsin that he had inherited with his brother in the 1993, and had been in his family for over one hundred years. (Id. ¶16.)

Between 1998 and 2001, Mr. Forbes spent several million dollars renovating and maintaining the Wisconsin property that had been transferred into the Forbes Family Trust although, nominally, he no longer owned it. (See id. ¶¶17, 18.) To account for the money spent on the trust's behalf, the trust executed promissory notes in the amount of $2.8 million in favor of Mr. Forbes and secured payment with mortgages on the trust property. (Rule 56(a)1 Statement ¶19.) In March 2001, a month after his indictment, Mr. Forbes realized that the promissory notes and

mortgages related to the trust were in his name and instructed Mr. Tucker to have the notes and mortgages redone so that the money he had put into the trust was now due to his then wife, Caren Forbes. (Id. ¶20.) The net effect of this scheme was to transfer another $2.8 million in additional cash out of Mr. Forbes' nominal control for no consideration. (See id. ¶¶19, 20.)

On the same day the Forbes Family Trust was executed, June 8, 1998, a mere six weeks following Cendant's announcement, Mr. Forbes also transferred his interest in property located in Vail, Colorado to Mrs. Forbes for the nominal consideration of $10.00. (Id. ¶21.) Mrs. Forbes subsequently sold that property for $13.5 million in November 2001. (Id. ¶22.) Six months later, on December 4, 1998, Mr. Forbes transferred his property interest and golf club membership located in Vero Beach, Florida to Mrs. Forbes for the nominal consideration of $10.00. (Id. ¶23.)

The settlement of the shareholders' suits – caused by Mr. Forbes criminal activities – was announced on December 7, 1999, serving as another reminder to Mr. Forbes that his debts were about to come due. (Rule 56(a)1 Statement ¶7.) Accordingly, a mere eight days later, on December 15, 1999, Mr. Forbes transferred his interest in the Forbes family home, located in New Canaan, Connecticut, to Mrs. Forbes for the nominal consideration of $10.00. (Id. ¶24.)

Mr. Forbes readily admits that the transfers of his interests in the real estate located in Connecticut, Florida, and Colorado were fraudulent. (See id. ¶¶25 – 27.) With respect to the New Canaan, Connecticut transfer, he testified:

Q. And why did you transfer your interest in the New Canaan property to your wife for $10.00?

A. At the time I felt that it was going to be subject to a lot of civil suits. I thought it might provide some more protection to her and the kids, so I transferred it.

. . .

Q. When you said that you were concerned about potential civil liabilities earlier were you referring to securities litigation involving Cendant Corp. formerly known as CUC?

A. There were class action suits and other things floating around in a general category.

Q. Those were the securities litigation?

A. I believe so.

. . .

Q. But you did have concern about civil liability from the Cendant shareholders suit; is that correct?

A. Well, they cropped up instantly in '98, so I was.

Q. You were aware of that?

A. I was. Sure.

Q. And you were concerned about that?

A. I was.

(Id. ¶25.) His testimony was nearly identical with respect to the Vero Beach, Florida and Vail, Colorado transfers. (See Id. ¶¶ 26, 27.) His admitted sole motivation for the transfers was the avoidance of his creditors. (Id. 26, 27.)

Mr. Forbes' fraudulent transfers were not limited to real estate. (Rule 56(a)1 Statement ¶¶28 – 33.) Through wire transfers on July 29, 1998 and August 5, 1998,

Mr. Forbes transferred $14 million in cash into bank accounts in his wife's name. (Id. ¶28.) On the same day as the $10 million transfer to his wife, July 29, 1998, Mr. Forbes also transferred $150,000 to each of his four daughters. (Id. ¶29.) In January 2000, he transferred another $4.4 million to Mrs. Forbes. (Id. ¶30.) Mrs. Forbes claimed to have no knowledge of the cash transfers – Mr. Forbes simply put the money into accounts in her name to put it out of his legal possession, but maintain actual control. (See id. ¶31.)

Between 1998 to 2003, Mr. Forbes transferred hundreds of thousands of dollars in cash and valuable securities to his daughters for no consideration. (Id. ¶32.) He also transferred over $200 thousand in cash to his long-time friend and personal attorney, Robert Tucker, for no consideration. (Rule 56(a)1 Statement ¶33.)[3]

Mr. Forbes' series of fraudulent transfers, combined with his lack of income after leaving Cendant and massive legal fees associated with his criminal defense, led to a dramatic decrease in his financial resources. (See id. 34 – 37.) Prior to April 1998, Mr. Forbes had net assets exceeding $68 million. (Id. ¶34.) By 2003, his net assets had dwindled by nearly 75%, down to $17.2 million. (Id. ¶35.) After the commencement of his trials, he even ran out of his own money to pay his lawyers, so he arranged for his wife to take a mortgage out on the New Canaan property that he had already fraudulently transferred to her in 1999. (Id. ¶36.) By April 2006, Mr.

[3] Notably, by settlement agreements dated October 19, 2009, October 30, 2009, and November 25, 2009, the Government and Cendant Corp. reached a settlement with Mr. Forbes' family members and Mr. Tucker with regard to the transfers detailed above.

Forbes simply stopped paying his lawyers. (Id. ¶37. ("The last payment my firm received [from Mr. Forbes] was in April 2006, which only covered a fraction of the outstanding fees owed at that time."))

3. Facts Relevant to Claims Against Beth Freimour (Twenty-Third and Twenty-Fourth Counts)

After leaving Cendant in July 1998, Mr. Forbes began working fulltime at FG II Ventures, LLC ("FG II"), a venture capital firm he founded. (Rule 56(a)(1) Statement ¶38.) Beth Freimour, who was Mr. Forbes' assistant at Cendant, left Cendant and joined FG II to work with Mr. Forbes in the same capacity. (Id. ¶39.) Ms. Freimour was employed by FG II from approximately August 1998 to December 2007 and was supervised by Mr. Forbes. (Id. 40.) Ms. Freimour had no contract of employment with either FG II or Cendant and FG II did not publish an employee handbook or manual. (Id. ¶¶41, 42.) Further, FG II did not offer any employee benefit program for the provision of legal services. (Id. ¶43.)

While employed by Cendant and FG II, Ms. Freimour was questioned in connection with the criminal investigations relating to Mr. Forbes. (Id. ¶44.) Ms. Freimour hired the law firm of Arent Fox Kintner Plotkin & Kahn, PLLC to represent her with respect to the investigation. (Rule 56(a)1 Statement ¶45.) Each month, Ms. Freimour paid her legal fees out of her own bank account, but was then reimbursed in the exact amount by Mr. Forbes. (Id. ¶46.) As further indicated in the chart below, between November 11, 2000 and November 13, 2006, Ms. Freimour was given $107,081.84 by Mr. Forbes ostensibly for reimbursement of her legal expenses:

| DATE[4] | AMOUNT |
|---|---|
| 11/21/2000 | $10,000.00 |
| 5/9/2001 | $249.24 |
| 5/19/2003 | $850.00 |
| 7/1/2003 | $8,590.00 |
| 8/19/2003 | $1,200.00 |
| 9/11/2003 | $1,006.24 |
| 9/25/2003 | $5,325.00 |
| 10/17/2003 | $12,498.90 |
| 11/26/2003 | $8,011.25 |
| 1/30/2004 | $8,224.24 |
| 2/27/2004 | $8,351.60 |
| 4/13/2004 | $2,324.20 |
| 4/14/2004 | $3,099.96 |
| 1/28/2005 | $2,600.70 |
| 3/9/2005 | $3,800.00 |
| 4/20/2005 | $3,477.00 |
| 6/3/2005 | $2,075.00 |
| 7/14/2005 | $1,050.25 |
| 8/17/2005 | $935.25 |
| 9/30/2005 | $2,040.75 |
| 11/27/2005 | $3,175.42 |
| 12/19/2005 | $5,280.20 |
| 1/26/2006 | $3,401.24 |
| 2/24/2006 | $3,095.15 |
| 4/20/2006 | $1,850.25 |
| 6/14/2006 | $3,560.00 |
| 11/13/2006 | $1,010.00 |
| **TOTAL** | **$107,081.84** |

4 The date column represents the dates the payments from Mr. Forbes were made to Ms. Freimour, not the date she was invoiced for legal services.

(Id. ¶47.) Mr. Forbes did not receive any consideration for these transfers and was not legally obligated to provide Ms. Freimour with legal representation. (Id. ¶49.)

The reimbursements came directly from Mr. Forbes, not FG II. (See id. ¶48 – 56.) During the relevant time period, Rodd Evonsky was FG II's controller. (Id. ¶50.) In that capacity, Mr. Evonsky handled the accounting books for FG II, including the disbursement of distributions from the various FG Entities to the FG II clients in their pro rata shares. (Rule 56(a)(1) Statement ¶51.) Mr. Evonsky was also responsible for monitoring all of the bank accounts for FG II and reconciling the accounts. (Id. ¶52.) Indeed, Mr. Evonsky referred to himself as the FG II "bookkeeper." (Id. ¶53.) Accordingly, it was not possible for FG II to make a payment without Mr. Evonksy's knowledge. (Id. ¶¶ 54, 55.) FG II made no payments to Ms. Friemour for reimbursement for her legal expenses. (Id. ¶56.)

4. Facts Relevant to Claims Against Frank Gallagi (Nineteenth and Twentieth Counts)

Mr. Gallagi began working at FG II in the summer of 1999. (Id. ¶57.) Mr. Forbes and Mr. Gallagi, along with the rest of the staff of FG II, were investment advisors whose jobs were to investigate and evaluate potential investments. (Rule 56(a)1 Statement ¶58.) FG II operated what was known as a "call fund" for high-net worth individual investors. (Id. ¶59.) The purpose of FG II was to find potential business opportunities and determine whether the opportunity represented a good investment. (Id. ¶60.) The business ventures that FG II considered would typically be illiquid investments that required FG II to invest a minimum amount of capital. (Id. ¶61). If, after thoroughly investigating the investment and engaging in due diligence,

FG II determined it was a worthwhile investment, FG II would attempt to "fill the order" for the minimum required capital investment by soliciting investments from its clients. (Id. ¶62.) Once FG II had collected enough capital to fill the order, it would form a limited liability company solely for the purpose of investing in the venture. (Id. ¶63.) The LLC was typically given an "FG" prefix.[5] (Rule 56(a)1 Statement ¶64) For example, the FG Entity used to invest in Jamba Juice Co. was called FG - JJ. (Id. ¶65.) Any distributions made by the underlying business investment would be made to the FG Entity, in turn, would distribute the funds to the individual investors in their pro rata shares. (Id. ¶66.)

Mr. Forbes repeatedly referred to the FG Entities as "partnerships" during his deposition. (Rule 56(a)1 Statement ¶66.) Further, all the members of the LLC had ownership interests in some of the same investments. (Id. ¶67.) In addition, Mr. Forbes, Mr. Gallagi, and Mr. Evonsky all had managerial responsibility over FG II. (Id. ¶68.)

Mr. Forbes invested in a number of the FG Entities, both individually and through his personal investment vehicle, FG Enterprises LLC. (Id. ¶70.) In this action, Mr. Forbes has stipulated that FG Enterprises is single-member LLC in which he is the only member and that its assets "should be available as partial satisfaction of the Restitution Order." (Id. ¶71.) Mr. Forbes concedes that FG Enterprises is simply "a piece of paper" and that any assets owned by FG Enterprises LLC are his. (Id. ¶72.)

---

[5] Hereinafter, the LLC's created by FG II will be referred to collectively as the "FG Entities."

Through an Assignment and Assumption Agreement dated January 1, 2002, Mr. Forbes transferred all of his interests in the following FG Entities to Mr. Gallagi for one dollar: FG-CEI; FG-EC; FG-ECB; FG-SKY; FG-OCTV; FG-CAP; and FG-SWB. (Rule 56(a)1 Statement ¶73.) Through a similar Assignment and Assumption Agreement also dated January 1, 2002, FG Enterprises LLC transferred all of its interests in the following FG Entitles to Mr. Gallagi for one dollar: FG-CEID; FG-RAL; FG-ED; FG-IH; FG-JJ; FG-MH; FG-STWT; FGCAP; FG-SB; FG-USG (Id. ¶74.) No one at FG II conducted any due diligence to determine the actual value of the interests at the time of the transfer. (Id. ¶75.)

The FG Entities transferred to Mr. Gallagi from Mr. Forbes and FG Enterprises were worth substantially more than the $2.00 Mr. Gallagi paid for them. (See id. ¶¶76 – 79.) According to the Investor Summary created by Rodd Evonsky on or about August 17, 2001, the then current value of the investments transferred from Mr. Forbes to Mr. Gallagi was approximately $439,009 and the value of the investments transferred from FG Enterprises LLC to Mr. Gallagi was $698,406. (Id. ¶76.) Moreover, as summarized by the following chart, between 2003 and 2006, the transferred interests distributed $868,903.00 in cash and marketable securities to Mr. Gallagi:

| Entity | Distribution Amount |
|---|---|
| 2003 | |
| F.G. – EC | $51,006.00 |
| F.G. – ECB | $27,403.00 |
| F.G. – ED | $22,818.00 |
| F.G. – MH | $99,212.00 |

| | |
|---|---|
| 2004 | |
| F.G. – OCTV | $30,495.00 |
| 2005 | |
| F.G. – CEI | $73,718.00 |
| F.G. – CEID | $38,621.00 |
| 2006 | |
| F.G. – CEI | $11,927.00 |
| F.G. – CEID | $6,256.00 |
| F.G. – JJ | $151.156.00 |
| F.G. – RAL | $356.291.00 |
| **TOTAL** | **$868,903.00** |

(Id. ¶77.) In addition, as proof that Mr. Forbes did not think these investments were worthless, in June 2003 (after the Assignment and Assumption Agreements were executed), he re-invested in shares of Milkhaus Laboratory Inc., the underlying investment in FG – MH, one of the FG Entities he transferred to Mr. Gallagi. (Rule 56(a)1 Statement ¶79.)

As further evidence that Mr. Gallagi and Mr. Forbes knew that these assignment and assumption agreements were not honest, arms length transactions at the time they were made, the agreements, while dated Janauary 1, 2002, were substantially backdated. (See id. ¶¶82 – 86.) In fact, Mr. Evonsky testified that although he witnessed the agreements as dated January 1, 2002, the agreements were first contemplated, drafted, and signed sometime late in 2002. (Id. ¶79.) More importantly, the actual transfers did not occur until sometime in 2003. (See id.¶¶80 – 83.)

More to the point, what honest, arms-length transaction provides a return on investment of 43,500,000% in four years (Mr. Gallagi's $2 investment in 2003 returned $868,903 by the end of 2006)?[6]

## II. ARGUMENT

Summary judgment should be granted where, as here, "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." DeRossi v. Nat'l Loss Mgmt., 328 F. Supp. 2d 283, 287 (D. Conn. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "When a motion for summary judgment is properly supported by documentary and testimonial evidence . . . the nonmoving party may not rest upon the mere . . . denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact." United States v. Moore, 156 F. Supp. 2d 238, 242 (D. Conn. 2001).

### A. The Undisputed Material Facts Demonstrate, As A Matter Of Law, That The Transfers Outlined In The Twentieth and Twenty-Fourth Counts Of The Third Amended Joint Complaint Constitute Constructive Fraudulent Transfers

For the reasons set forth below, the United States respectfully requests the entry of summary judgment against defendant Frank Gallagi on the Twentieth Count

[6] As a basis of comparison a $1000 investment in Microsoft Corp. in 1986 would have been worth $386,250 in May 2007 for a return on investment of 38,525% over 21 years. *Cf.* http://my-wealth-builder.blogspot.com/2007/08/great-investment-for-1000.html.

and against defendant Beth Freimour on the Twenty-Fourth Count of the Third Amended Joint Complaint. The undisputed facts clearly establish that the transfers from Mr. Forbes to Mr. Gallagi and Ms. Freimour constitute constructive fraudulent transfers pursuant to 28 U.S.C. § 3304(b).

Under the Federal Debt Collection Procedure Act ("FDCPA"), there are four essential elements of a constructive fraudulent transfer: (1) the debtor owes a debt to the United States; (2) the debtor engages in a transfer, whether or not that transfer occurred before or after the debt to the United States was incurred; (3) the debtor did not receive reasonably equivalent value in exchange for the transfer; and (4) the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. See 28 U.S.C. § 3304(b). The undisputed facts clearly establish all four elements here with respect to the transfers to Mr. Gallagi and Ms. Freimour.

1. Mr. Forbes Owes A Debt To The United States

Mr. Forbes owes a debt to the United States. The FDCPA broadly defines a debt as "an amount that is owing to the United States on account of . . . restitution. . . or other source of indebtedness to the United States, but that is not owing under the terms of a contract." 28 U.S.C. § 3002(3)(B); see also Moore, 156 F. Supp. 2d at 247 (finding summary judgment pursuant to section 3304(b)(1)(ii) was appropriate). Mr. Forbes' debt to the United States arose on January 17, 2007, the date of the Order of Restitution. For the purposes of a constructive fraudulent transfer under section 3304(b)(1)(ii), it does not matter that the debt arose after the transfers.

2. Mr. Forbes Engaged In Transfers To Defendants Mr. Gallagi And Ms. Freimour

Mr. Forbes transferred property to Mr. Gallagi and Ms. Freimour. With respect to Mr. Gallagi, he himself admits that Mr. Forbes and FG Enterprises LLC transferred to him their respective interests in the FG Entities identified on the Assignment and Assumption Agreements (hereinafter "FG Entity Transfers") (See Rule 56(a)1 Statement ¶77.) He only disputes the intent behind the transfers. Further, it is not disputed that the assets transferred from FG Enterprises were the sole property of Mr. Forbes. (See id. ¶¶ 68, 69.)

Ms. Freimour also admits transfers took place. (See id. ¶¶ 46, 47.) She admits that the transfers at issue were reimbursements for her legal fees incurred as a result of her questioning in the Mr. Forbes criminal investigation. (See id. ¶¶ 46, 47.) For the purposes of the FDCPA, a "reimbursement" is a transfer by a different name. See 28 U.S.C. §3301(8) ("'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.")

Despite Ms. Freimour's purported confusion over the source of the reimbursement payments, it is undisputed that the payments came from Mr. Forbes. (Compare id. ¶¶48, 49; with Freimour Dep., Exhibit O to Local Rule 56(a)1 Statement, 138:4-8) ("My denial is that I never would have referred to them as transfers as they were reimbursements. And I don't know -- I mean, I couldn't swear where the money came from. I know I was being reimbursed but at the time I didn't

really care who it was coming from.") Moreover, Rodd Evonsky testified that, as controller of FG II, he was in control of FG II's bank accounts and would have known if FG II paid Ms. Freimour for her legal bills. (Rule 56(a)1 Statement ¶¶50 – 56.) He did not recall any such payment taking place. (Id. ¶ 56.) The second element, therefore, is established. Namely, Mr. Forbes transferred money to Mr. Gallagi and Ms. Freimour.

3. Mr. Gallagi And Ms. Freimour Did Not Give Reasonably Equivalent Value For The Transfers From Mr. Forbes

Neither Mr. Gallagi nor Ms. Freimour gave reasonably equivalent value for the transfers from Mr. Forbes.[7] As to the claims against Mr. Gallagi, according to the Investor Summary created by Rodd Evonsky on or about August 15, 2001 (Exhibit S to the Rule 56(a)1 Statement), the then current value of the investments transferred from Mr. Forbes to Mr. Gallagi was approximately $439,009 and the value of the investments transferred from FG Enterprises LLC to Mr. Gallagi was $698,406 ($1,137,415 total). (See Rule 56(a)1 Statement ¶73.) The value of the transferred

[7] The FDCPA defines both "value" and "reasonably equivalent value," but neither definition is particularly enlightening in the present circumstance.

(a) Transaction. Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but Value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

(b) Reasonable Equivalent Value. For the purposes of sections 3304 and 3307, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of such interest upon default under a mortgage, deed of trust, or security agreement.

28 U.S.C. § 3303.

FG Entities was proven when, between 2003 and 2006, the transferred interests distributed $868,903.00 in cash and marketable securities to Mr. Gallagi. (See id. ¶ 74.) The nominal value ($2.00) Mr. Gallagi gave was clearly not reasonably equivalent to what he received. See Moore, 156 F. Supp. 2d at 246 (nominal payment of $10.00 did not constitute reasonably equivalent value); United States v. Sherrill, 626 F. Supp. 2d 1267, 1274-75 (M.D. Ga. 2009).

A concrete example highlights the point. One of the investment interests transferred by FG Enterprises to Mr. Gallagi was FG – JJ, which represented an interest in Jamba Juice Co. (Rule 56(a)1 Statement ¶65.) According to the Investor Summary, the value of FG Enterprises' interest in FG – JJ was $62,857. (See Exhibit S to Rule 56(a)1 Statement at BS44-02197.) Thereafter, in 2003, FG Enterprises' interest in FG – JJ was transferred to Mr. Gallagi, along with the other interests, for a collective price of $1.00. (Rule 56(a)1 Statement ¶71.) Then, in 2006, the value of FG – JJ was realized when it distributed $151,156 to Mr. Gallagi. (Id. ¶74.) Mr. Gallagi himself described the FG – JJ distribution as a "windfall." (Gallagi Dep., 107:9-14, Exhibit P to Rule 56(a)1 Statement.)[8] Indeed, nine of the seventeen transferred investments returned a distribution to Mr. Gallagi. (Compare Rule 56(a)1 Statement ¶¶70, 71; with ¶74.) Such a return on these illiquid, venture capital investments would represent an unusual and extraordinary success generally, much

---

[8] "Windfall" is defined as "an unexpected, ***unearned***, or sudden gain or advantage." Merriam-Webster's Collegiate Dictionary 1355 (10th ed. 1999) (emphasis added). Mr. Gallagi's use of the term "windfall" is entirely apropos with regard to the FG – JJ transaction, and it also accurately describes the other transfers as well.

less for investments defendants claim Mr. Forbes sold because he had already determined them to be worthless. As Mr. Gallagi testified:

> Q. In fact, all of the FG dash LLCs that you invested in either with your own money or Mr. Forbes paid for and gave to you as a bonus or equity interest as part of your employment, they were, by their very nature, illiquid; isn't that right?
>
> A. Yes. And I can actually add to that, extremely speculative. That is our business, high risk, potentially high reward venture opportunities. So yes, they were at the beginning, and they are deemed speculative investments up until the exit in my eyes.

(Gallagi Dep., 165:20 – 166-6, Exhibit P to Rule 56(a)1 Statement.) Similarly, Mr. Evonsky testified:

> In private equity, Venture Capital, which Venture Capital being much earlier stage companies, typically it's known that there will be, you know, -- and I don't want to peg a number to it –- but there will be a number of investments which will fail and you always kind of look for the ones that succeed and are going to pay off the big dollars.

(Evonsky Dep., 104:6-12, Exhibit Q to Rule 56(a)1 Statement.) Mr. Gallagi certainly did receive a windfall, because he did not pay for the substantial benefit he received.

The third element, lack of the exchange of reasonably equivalent value, is also established as to the Beth Freimour transfers, because Mr. Forbes did not receive any value – nominal or otherwise. While Ms. Freimour may believe that Mr. Forbes had some moral or chivalrous obligation to pay her legal bills, the law does not agree. Mr. Forbes had no obligation to pay Ms. Freimour's legal expenses. Chivalry and friendship do not constitute "value" as defined by the FDCPA. See Moore, 156 F. Supp. 2d at 246 n.2 ("Any intangible, emotional benefit is not included within the

meaning of reasonable equivalent value, because "within the meaning of the statute, value means economic value.") (internal quotations omitted). Ms. Friemour was never employed by Mr. Forbes personally and had no employment agreement providing for coverage of her legal expenses. (See Rule 56(a)1 Statement ¶¶40 – 43.)

4. Mr. Forbes Engaged In The Transfers To Mr. Gallagi And Ms. Freimour At A Time When He Believed Or Reasonably Should Have Believed That He Would Incur Debts Beyond His Ability To Pay As They Became Due

The transfers to Mr. Gallagi were made in 2003. (See Rule 56(a)1 Statement ¶¶80 – 83.) The transfers to Ms. Freimour began in May 2003 and carried forward through Mr. Forbes' three trials and past his conviction. (Id. 47.) By 2003, Mr. Forbes was already well aware of the Shareholders Suits and Cendant's settlement of the Shareholder Suits, he already been indicted, and was soon facing the commencement of his first criminal trial. In short, Mr. Forbes was facing liability for billions of dollars in potential civil judgments, SEC fines, and criminal restitution. His creditors were all around him.

In fact, it cannot reasonably be argued that Mr. Forbes was unaware of the liabilities he faced. When asked about the December 1998 transfer of his interest in the Vero Beach condominium, he indicated that the only motivating factor for the transfer was his potential civil liability from the Shareholder Suits. (See Rule 56(a)1 ¶26.) He similarly testified as to the transfer of his interest in the New Canaan house a year later, that "[a]t the time I felt that it [the house] was going to be subject to a lot of civil suits. I thought it might provide some more protection to her [his wife] and the

kids, so I transferred it." (Id. ¶25.) Between 1999 (when he transferred the New Canaan house) and 2003 (when the transfers to Mr. Gallagi took place) the precariousness of Mr. Forbes' financial position got worse, not better.[9] Not only did he know that Cendant had paid $2.85 billion in settlement of the shareholder suits and would likely be seeking contribution from him, but he also knew at that time that the SEC and the Department of Justice were investigating him with an eye toward criminal prosecution. Added to this, Mr. Forbes was hemorrhaging attorneys' fees. By April 2006, Mr. Forbes stopped paying his attorneys all together. (See id. ¶¶36, 37.)

Accordingly, as the undisputed facts establish all of the necessary elements of a constructive fraudulent transfer under 28 U.S.C. § 3304(b), the United States respectfully requests the entry of summary judgment on the Twentieth Count against Frank Gallagi and on the Twenty-Fourth Count against Beth Freimour.

B. The Undisputed Material Facts Demonstrate, As A Matter Of Law, That The Transfers Outlined In The Nineteenth And Twenty-Third Counts Of The Third Amended Joint Complaint Constitute Intentional Fraudulent Transfers

For the reasons set forth below, the United States respectfully requests entry of summary judgment against defendant Frank Gallagi on the Nineteenth Count and against defendant Beth Freimour on the Twenty-Third Count of the Third Amended Joint Complaint. The undisputed facts clearly establish that Mr. Forbes engaged in

---

[9] Similarly, during the time period (2000-2006) which Mr. Forbes made the fraudulent transfers to Ms. Friemour, Mr. Forbes' financial position and legal status grew steadily and appreciably worse.

the transfers to Mr. Gallagi and Ms. Freimour with the actual intent to hinder, delay, or defraud his creditors. 28 U.S.C. § 3304(b)(1)(A).

There are two essential elements of an intentional fraudulent transfer under the FDCPA: (1) that the debtor engages in a transfer, whether or not that transfer occurred before or after the debt to the United States was incurred; and (2) that the debtor makes the transfer with the actual intent to hinder, delay, or defraud creditors. See 28 U.S.C. § 3304. As discussed in greater detail above (supra at § II.A.2 at 15-16), the first element is clearly met as there is no dispute that Mr. Forbes engaged in the transfers that form the basis of the Nineteenth and Twenty-Third Counts. With respect to the "actual fraud" prong, the FDCPA states, in relevant part:

> In determining actual intent . . . consideration may be given, ***among other factors***, to whether --
>
> (A) the transfer or obligation was to an insider;
>
> (B) the debtor retained possession or control of the property transferred after the transfer;
>
> (C) the transfer or obligation was disclosed or concealed;
>
> (D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (E) the transfer was of substantially all the debtor's assets;
>
> (F) the debtor absconded;
>
> (G) the debtor removed or concealed assets;
>
> (H) the value of the consideration received by the debtor was reasonably equivalent to the value

of the asset transferred or the amount of the obligation incurred;

(I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

28 U.S.C. § 3304(b)(2) (emphasis added) (formatting altered).

As the text of the statute specifies, the so-called badges of fraud listed in section 3304(b)(2) are non-exclusive, and the Court is free to consider other factors, including direct proof of fraud. See United States v. Woods, No. 5:07-CV-187-BR, 2008 U.S. Dist. LEXIS 110151, at *8 (E.D. N.C. Dec. 9, 2008.) (factors listed in section 3304(b)(2) are "non-exclusive."); aff'd, United States v. Woods, No. 09-1296, 2009 U.S. App. LEXIS 21447 (4th Cir. N.C. Sept. 30, 2009).[10] In fact, the badges of fraud exist primarily because – as a general matter – direct proof of fraudulent intent is so rare. See United States v. Sherrill, 626 F. Supp. 2d 1267, 1272 (M.D. Ga. 2009); see also Cadle Co. v. White, No. 3:02-CV-00030(TPS), 2006 U.S. Dist. LEXIS 11671, at *18 (D. Conn. Mar. 21, 2006) ("Because direct evidence of fraud is often lacking the badges of fraud allow the fact finder to infer fraudulent intent from other proven facts."). In this instance, however, Mr. Forbes' own words and actions provide direct evidence of fraudulent intent.

[10] All unreported cases cited are attached hereto as Exhibit AA.

1. Direct Proof Of Fraudulent Intent

In this case, there is actual evidence of Mr. Forbes' intent to hinder, delay or defraud his creditors. Mr. Forbes admits that as of June 8, 1998 he engaged in fraudulent transfers. (See Rule 56(a)1 Statement ¶¶25 – 27.) He testified that he transferred his properties in Connecticut, Florida and Colorado in 1998 and 1999 to protect them from his potential liabilities arising from the Shareholder Suits that, in his words, "cropped up instantly" following Cendant's announcement of the Fraud. (Id.) His knowledge of his financial predicament and his intent could not and did not change afterwards, because his financial predicament only grew worse. Prior to April 1998, Mr. Forbes was a very rich man. (See id. ¶34) (showing a total net worth of approximately $68 million in 1997). After April 15, 1998, however, his assets quickly dissipated and his liabilities quickly grew. (See id. ¶35) (indicating a total net worth of approximately $17.2 million in 2003.) With his liabilities mounting, Mr. Forbes was simply not in a position to engage in transfers of valuable property for less than reasonably equivalent consideration. He needed the money.

Moreover, between 1998 and 2000, Mr. Forbes engaged in a number of other transfers that were clearly fraudulent. In 1998, he transferred $14 million to accounts in his wife's name. (Id. ¶28.) In 2000, he transferred over $4.4 million more. (Id. 30.) Mrs. Forbes claimed to have no knowledge of the transfers – Mr. Forbes simply put the money into accounts in her name to put his out of his legal possession, but maintain actual control. (Rule 56(a)1 Statement ¶31.) In addition, he transferred

hundreds of thousands of dollars in cash and securities to his daughters during the same time for no consideration. (Id. ¶32.)

Further, within nine days of Cendant's announcement of the discovery of the Fraud, Mr. Forbes' friend and personal attorney, Robert Tucker, called Attorney Potts and asked him to draft the Forbes Family Trust. (Id. ¶13.) Attorney Potts acknowledged that the reason Mr. Forbes and Mr. Tucker were now scurrying to create the Trust was to quickly get the Wisconsin property out of Mr. Forbes' name to avoid his creditors. (See id. ¶¶14, 15.)[11] Between 1998 and 2001, Mr. Forbes continued to treat the Trust property as his own, however, laying out over $2.8 million for construction and maintenance. (See id. ¶17.) Highlighting the absurdity of the transaction, Mr. Tucker and another lawyer, Michael Milliken, created the fiction that the money Mr. Forbes advanced to the Trust was actually a loan, securing these purported loans with notes and mortgages on the trust property. (Id. ¶19.) Almost immediately after his indictment, Mr. Forbes realized that the loans could not be in his name. To leave them that way would defeat the fraudulent intent of forming the Trust in the first place. His creditors could simply foreclose on the mortgages and take the property. So, Mr. Forbes did exactly what he did with the other properties, he fraudulently transferred all the notes and mortgages to his wife. (Rule 56(a)1 Statement ¶20.)

[11] While Mr. Forbes attempted to argue that the Forbes Family Trust was not a fraudulent transfer because he had been considering creating the trust for years, the evidence undisputedly demonstrates that the impetus for the creation of the trust in 1998 was Cendant's announcement of the Fraud.

In a different procedural posture, this Court has already noted that after April 15, 1998, Mr. Forbes' behavior was tainted with fraud. On April 15, 2009, the Court held a telephonic status conference to discuss a motion filed by the United States and Cendant for a discovery order finding that Mr. Forbes' communications with his attorneys was not protected by the attorney-client privilege, because the crime fraud exception applied. (See Emergency Joint Motion for Discovery Order as to Depositions dated April 1, 2009, Dkt. 174.) The Court was persuaded that Mr. Forbes' communications with his attorneys after April 15, 1998 about transferring his property were virtually *per se* encompassed by the crime fraud exception:

> Obviously those things that occurred on or after the time of the accounting irregularities, April 15th, the disclosure April 15, 1998, taken in conjunction with his acknowledgement that the other property transfers around that time were for the purpose of removing assets from creditors . . . .
>
> . . .
>
> So if the subject matter is going to be the formation and the operation of the Forbes Family Trust, and it was only created by the agreement dated June 8, 1998, and that's undisputedly after all the scandal and suits, it's hard for me to understand how any attorney-client privilege can be asserted when fraud undisputedly took place, that is, the accounting fraud, and the suits to recoup the value of the lost shares provided all of the basis for transferring assets away from creditors, that is, that the communications of the lawyers with Mr. Forbes in aid of making these transfers would have probably been in order to advance the purpose of the fraud.

(Tr., 16:18 – 17:6; 21:16 – 22:4, attached as Exhibit BB.)

Here, defendants claim that the transfers to Mr. Gallagi were made for tax reasons, but the proffered explanation also makes no sense. The assets transferred to Mr. Gallagi clearly had value at the time of the transfer. The distributions speak for themselves. Moreover, the timing is dispositive. By 2003, Mr. Forbes' financial position had gotten much worse than it was in 1998. He had no income to speak of and his liabilities were mounting. Mr. Forbes needed the cash that these investments distributed much more than he needed the modest tax write-off. This transaction reeks of a man who knew that his debts had come due, and would rather see his friends and family benefit from his few remaining assets then his victims.

Any assertion by Mr. Gallagi that these transfers were made to him for tax reasons is counterfactual. Mr. Forbes and Mr. Gallagi, along with the rest of the staff of FG II, were investment advisors whose jobs were to investigate and evaluate potential investments. (See Rule 56(a)1 Statement ¶¶58 - 62.) Nevertheless, no one at FG II conducted any due diligence to determine the actual value of the interests at the time of the transfer. (Id. ¶72.) Everyone involved with this transaction had experience in the private equity business and knew how to evaluate these assets. Indeed, they advised their clients to invest in these very same assets precisely because they thought the investments had value. These assets could easily have been evaluated, but defendants chose not to do so precisely because this was not an arm's length transaction. It was a fraudulent transfer intended as a gift to a friend and to defraud Mr. Forbes' victims. Mr. Forbes knew these investments were not worthless; he even re-invested in Milkhaus Laboratories Inc., the underlying

investment in FG – MH (one of the FG Entities transferred to Mr. Gallagi) after the Assignment and Assumption Agreements were purportedly executed. (Id. ¶76.)

Defendants' last argument, that Mr. Forbes derived the benefit of a tax deduction from these fraudulent transfers, is similarly without merit. This argument, taken to its logical conclusion, would provide a free pass to all would-be fraudsters so long as they report the transfer on their tax return. Taking a tax write-off as a result of this transaction does not make the transfer any less fraudulent. Mr. Forbes did it at time when he had billions of dollars in debt and after he already admitted that he had fraudulently transferred other assets in an attempt to avoid that debt. His taxes are irrelevant to the analysis. If Mr. Forbes had taken a $10 million tax write-off on his 1999 taxes when he transferred his home to his wife for $10 dollars, it would not have made that transfer any less fraudulent. The same holds true here.

With respect to Ms. Freimour, the critical issue is that Mr. Forbes made the transfers as part of his ongoing plan to transfer all of his assets to the detriment of his creditors. The Government does not dispute that Mr. Forbes engaged in the transfers to Mr. Freimour for the purpose of reimbursing her for the legal fees that she had incurred due to his transgressions. The undisputed facts demonstrate, however, that Mr. Forbes engaged in the transfers at a time when he was habitually transferring property out of his name to benefit a friends and family, and to avoid his creditors. Thus, the potentially chivalrous motive for the transfer does not make it any less fraudulent. Indeed, using the same analysis, other courts have found that transfers to charity were fraudulent. See Leibersohn v. Campus Crusade for Christ,

Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 111 (Bankr. E.D. Pa. 2002) ("It is . . . appropriate, to infer that, except for transfers to a person who took in good faith and for a reasonably equivalent value . . . all other transfers made by the debtor during an on-going Ponzi scheme are part of the overall fraud.")

2. The Transfers To Mr. Gallagi and Ms. Freimour Are Tainted With The Badges of Fraud

In addition to the direct evidence of fraudulent intent, there is indirect evidence of fraudulent intent by virtue of the existence of several badges of fraud. There are at least six badges of fraud are present with respect to the Mr. Gallagi transfers and at least five relative to the Ms. Freimour transfers.

a. Mr. Gallagi Is An Insider

Whether the debtor is an individual, corporation, or a partnership, the FDCPA defines "insider" as a general partner in a partnership within in which the debtor is also a partner. See 28 U.S.C. § 3301(5). That is the case with Mr. Gallagi. Although FG II is not technically a partnership, it is a closely-owned LLC in which Mr. Forbes and Mr. Gallagi were members. Accordingly, Mr. Forbes and Mr. Gallagi were business partners and, as such, Mr. Gallagi was an insider for purposes of the FDCPA.

b. Mr. Forbes Was Already Threatened With Suit

The transfers to Mr. Gallagi and Ms. Freimour were made at a time when Mr. Forbes had already been sued in the Shareholder Suits, was already in danger of a contribution suit by Cendant, was subject to an SEC investigation, and the target of a Department of Justice criminal prosecution. Threats of crushing liability were all

around. Therefore, it is beyond dispute that Mr. Forbes was both being sued and threatened with suit.

c. The Transfers Were Of Essentially All Mr. Forbes' Assets

The transfers to Mr. Gallagi and Ms. Freimour were made during a time when Mr. Forbes was in the process of transferring substantially all of his assets out of his name. By 2003, Mr. Forbes' assets had dwindled by approximately 75% and continued to decline precipitously thereafter. (Rule 56(a)1 Statement ¶¶34 – 37.) By April 2006, Mr. Forbes did not have enough assets at his disposal to pay his attorneys. (Id. ¶37.) Prior to that, Mr. Forbes was paying his attorneys with money that was purportedly not his, having mortgaged the New Canaan house he had already fraudulently transferred to his wife to raise money for his legal defense. (Id. ¶36.) Accordingly, when coupled with Mr. Forbes other fraudulent transfers and his outstanding debts, these transfers amounted to substantially all his assets.

d. Mr. Gallagi And Ms. Freimour Did Not Give Reasonably Equivalent Value

Mr. Forbes did not receive reasonably equivalent value for the Gallagi and Freimour transfers. The FG Entities transferred to Gallagi had substantial value for which Mr. Gallagi only paid $2. Likewise, other than Ms. Freimour's friendship and loyalty, Mr. Forbes received nothing in return for the transfers to Ms. Freimour.

e. Mr. Forbes Was Insolvent At The Time Of The Transfers

Mr. Forbes was insolvent at the time he made these transfers. Under the FDCPA, a debtor is considered insolvent if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 28 U.S.C. § 3302(a). Assets that

have already been fraudulently transferred are not considered in the insolvency calculation. (See id. at §3302(d).) As is discussed above, Mr. Forbes forced his wife to dip into the equity in the real estate assets that he already fraudulently transferred to her to pay his legal fees. Further, his liability to his victims was in the billions. Even at his financial height, Mr. Forbes could not have paid that liability. Accordingly, he did not have enough money to pay his debts. He was insolvent.

f. The Transfers Occurred Shortly Before The Restitution Order Was Issued

The transfers to Mr. Gallagi and Ms. Freimour were made shortly before Mr. Forbes was convicted of the crimes for which the restitution order would be imposed. The Gallagi transfers occurred in late 2003. The Freimour transfers began shortly before that and carried on through Mr. Forbes' conviction in October 2006. Under some circumstances, three years might not be considered a "short" period of time, but it is here because of the time it took to criminally prosecute Mr. Forbes. The shear length of Mr. Forbes' trials unusually prolonged the period of time between the transfers and the imposition of the restitution order. Further, Mr. Forbes co-defendant E. Kirk Shelton was convicted in January 2005 and sentenced to the same joint and several restitution order. Mr. Forbes knew what was coming.

Accordingly, the undisputed facts establish a direct intent on the part of Mr. Forbes to fraudulently transfer assets. This evidence of direct intent combined with the presence of at least six badges of fraud with respect to Mr. Gallagi and five badges of fraud with respect to Ms. Freimour, clearly establishes that Mr. Forbes engaged in the transfers with the actual intent to hinder, delay or defraud his

creditors. The United States, therefore, respectfully requests that the Court enter summary judgment on the Nineteenth Count of the Third Amended Joint Complaint against Frank Gallagi and the Twenty-Third Count against Beth Freimour.

C. Remedies Sought

Under the FDCPA, the United States is entitled to the following remedies with respect to any voidable transfer:

> (1) avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States;
>
> (2) a remedy under this chapter [28 USCS §§ 3301 et seq.] against the asset transferred or other property of the transferee; or
>
> (3) any other relief the circumstances may require.

28 U.S.C. §3306(a). In addition, "the United States may recover judgment for the value of the asset transferred, but not to exceed the judgment on a debt." 28 U.S.C. § 3307(b). Accordingly, the United States respectfully requests a judgment as follows.

1. As to Frank Gallagi

With respect to both the Nineteenth and Twentieth Counts against Frank Gallagi, which challenge the same transfers, the United States seeks:

a) a money judgment in the amount of $868,903.00, which represents the value of the distributions Mr. Gallagi received from the transferred entities that he would not have otherwise received but for the fraudulent transfers;

b) an order avoiding the transfers and declaring that the transferred entities are property of Mr. Forbes; and

c) an order that Mr. Gallagi execute any necessary documents or otherwise cooperate with the United States with respect to the transfer of the interests back into Mr. Forbes' name.

2. As to Beth Freimour

With respect to the Twenty-Fourth Count (constructive fraudulent transfer) against Ms. Freimour, the United States seeks a money judgment in the amount of 96,831.76, representing the value of the transfers Ms. Freimour received from May 19, 2003 to November 11, 2006.

With respect to the Twenty-Third Count (intentional fraudulent transfer) against Ms. Freimour, the United States seeks a money judgment in the amount of $107,081.84, which represents the total amount of transfers Ms. Freimour received from Mr. Forbes.

D. The United States' Claims Against Mr. Gallagi and Ms. Freimour Are Timely.

Mr. Gallagi and Ms. Freimour have both alleged statute of limitations as an affirmative defense. Intentional fraudulent transfer claims pursuant to 28 U.S.C. § 3306(b)(1) must be brought "within 6 years after the transfer was made or the obligation was incurred ***or, if later, within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant."*** (emphasis added).[12] Defendants seek to frame the issue as to whether the United States reasonably could have discovered the challenged transfers within two years of the

12 The United States believes that all of its claims are timely, however, the argument with regard to tolling only impacts the intentional fraudulent transfer claims. The constructive fraudulent transfer claims are clearly timely, because they were filed with six years of when the transfers occurred.

time the claims were brought. That issue, however, is irrelevant. As the United States' claims were equitably tolled until the imposition of the restitution order on January 17, 2007, those claims are timely regardless of when the transfers were discovered. See United States v. SCIP Partners L.P. et al., 3:06CV1827(AWT) (Dkt. 214) (attached as Exhibit CC.)[13] There is no dispute that the United States moved to add the claims against Ms. Freimour and Mr. Gallagi within two years of when the restitution order was imposed against Mr. Forbes. The claims, therefore, are timely.

## III. CONCLUSION

For the reasons stated herein, the United States respectfully requests that the Court enter summary judgment against defendant Frank Gallagi on the Nineteenth and Twentieth Counts of the Third Amended Joint Complaint and against defendant Beth Freimour on the Twenty-Third and Twenty-Fourth Counts.

---

[13] This case, and one brought by Cendant, Cendant v. Shelton et al., 3:06CV854(AWT), involved nearly identical claims of fraudulent transfers against Mr. Forbes' co-defendant, Mr. Shelton. So that the Court can fully appreciate the level of thought Judge Thompson put into his decision that § 3306(b)(1) is equitably tolled until the issuance of the restitution order, the United States is attaching a copy of two transcripts of telephonic status conferences with Judge Thompson where the issues was fully discussed. (See Exhibits DD and EE.)

PLAINTIFF –
UNITED STATES OF AMERICA
PAUL J. FISHMAN

Special Attorney
U.S. Attorney's Office, District of New Jersey

By: /s/ Jordan M. Anger
Jordan M. Anger – PHV02694
jordan.anger@usdoj.gov

Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Telephone: (973) 645-2829
Facsimile: (973) 297-2010