UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America, et al.<br>    *Plaintiffs*,<br><br>    *v.*<br><br>Walter A. Forbes, et al.,<br>    *Defendants.* | Civil No. 3:08cv933 (JBA)<br><br><br>September 30, 2010 |

RULING ON MOTION FOR SUMMARY JUDGMENT — GALLAGI

In this action brought by the United States and Cendant Corporation ("Cendant") to enforce the Restitution Order imposed on Defendant Walter A. Forbes by setting aside alleged fraudulent transfers of Forbes' assets to, or with the assistance of, the other defendants, the United States now moves for summary judgment against Frank Gallagi, to recover the value of constructive and intentional fraudulent transfers in violation of the Federal Debt Collection Procedure Act ("FDCPA").

I.    Undisputed Factual Background

Between 1983 and 1997, Walter A. Forbes served as Chairman and CEO of CUC International, Inc. (CUC), which merged with HFS Incorporated in December 1997 to form Cendant. On April 15, 1998, Cendant announced that during Forbes' tenure as CEO, accounting employees at CUC fraudulently inflated CUC's operating income. On February 28, 2001, a grand jury sitting in the District of New Jersey indicted Forbes and co–defendant E. Kirk Shelton, former President of CUC. The criminal cases were transferred to this District where Forbes was tried three times between 2004 and 2006. After two mistrials, Forbes was ultimately convicted of three of the four counts of the operative indictment and

was sentenced to 151 months incarceration and a $3.275 billion restitution order was imposed on him.

After leaving Cendant in July 1998, Forbes began working full–time at FG II Ventures ("FG II"), a venture capital firm he founded. Defendant Frank Gallagi began working at FG II in the summer of 1999. Like Forbes, Gallagi worked as an investment advisor, whose job it was to investigate and evaluate potential investments for high–net worth individual investors. FG II's purpose was to find potential business opportunities and determine whether those opportunities represented good investments. The typical business ventures FG II would consider were illiquid investments. If, after performing due diligence, FG II determined a business venture to be a worthwhile investment, it would solicit investments from its clients to fill the order for a capital investment. Once FG II had collected enough capital to fill the order, it would form a limited liability company ("LLC") to invest in the venture, and those LLCs were given "FG" prefixes. For instance, the FG entity that invested in Jamba Juice, Co. was called FG–JJ. Any distributions made by the underlying business investments would be made to the LLC, which, in turn would distribute the funds to the individual investors in *pro rata* shares. Forbes invested in a number of FG entities, personally, and through his personal investment vehicle, FG Enterprises, LLC. Forbes explained during his deposition that FG Enterprises, LLC is simply "a piece of paper" and that any assets owned by FG Enterprises, LLC would have been his. (Forbes Dep., Ex. C. to Loc. R. 56(a)1 Stmt. [Doc. # 238] at 61:12–65:6.)

At some point after January 1, 2002, Forbes transferred several FG entities he owned to Gallagi. Through the Assignment and Assumption Agreement entered into between Forbes and Gallagi dated January 1, 2002, Forbes assigned his "right, title, interest in and to

2

its Membership Interest in certain limited liability companies" (FG–CEI, FG–EC, FG–ECB, FG–SKY, FG–OCTV, FG–CAP, FG–SWB), to Gallagi in exchange for $1. (Assignment and Assumption Agreement between Forbes and Gallagi, Ex. T to Loc. R. 56(a)1 Stmt.) Under the Agreement, Gallagi assumed and agreed to perform all duties and obligations required of a Member of each transferred FG entity. (*Id.*) Through a similar agreement, also dated January 1, 2002, FG Enterprises LLC transferred all of its interests in the following FG entities to Gallagi for $1: FG–CEID, FG–RAL, FG–ED, FG–IH, FG–JJ, FG–MH, FG–STWT, FG–CAP, FG–SB, FG–USG. (Assignment and Assumption Agreement between FG Enterprises, LLC and Gallagi, Ex. U to Loc. R. 56(a)1 Stmt.) Gallagi similarly assumed and agreed to perform all duties and obligations required of a Member of each of those transferred FG entities. (*Id.*) Although both Agreements were dated January 1, 2002, neither was executed on that date. Rodd Evonsky, FG II's Controller, who witnessed both, explained in his affidavit that the transfers were likely executed later in the year, but he could not recall when specifically.

In his deposition, Forbes stated that his purpose in transferring the FG entities to Gallagi was "to take a tax write–off"; he explained that he "did this from time to time over the years, and [he] wanted to take advantage of the loss." (*Id.* at 113:11–13.) According to Evonsky, "people like to transfer their interests in certain investment vehicles . . . to take losses on their investments because they've held them for some period of time," and one way to take a loss is to transfer those vehicles to "a third party." (Evonsky Dep., Ex. C to Loc. R. 56(a)2 Stmt [Doc. # 246] at 30:6–11.)

Forbes did not ask Evonsky to value the FG entities listed in the two Agreements to determine their "current status" immediately preceding the transfers. However, on August

3

17, 2001, Evonsky prepared a summary of undistributed investments that "reflect[]ed . . . investments at their cost basis and values those that are privately held at the latest third party transaction." (Summary of Investor Undistributed Investments, Ex. S to Loc. R. 56(a)1 Stmt.) Based on the most recent third party transactions preceding August 17, 2001, the value of investments transferred from Forbes to Gallagi was $439,009, and the value of the investments transferred from FG Enterprises, LLC to Gallagi was $698,406. (*See id.*) Between 2003 and 2006, the FG entities that were transferred to Gallagi distributed $868,903.00 in cash and marketable securities. (Schedule K-1 Forms Issued to Frank Gallagi, Ex. V to Loc. R. 56(a)(1) Stmt.) Gallagi accepted $100,000 of the cash distribution from FG–JJ but he "contributed" cash from the other distributions back to FG II, to keep FG II a "going concern." (Gallagi Dep., Ex. P to 56(a)1 Stmt. at 66:24–68:10.) There was, however, no agreement between Gallagi and FG II committing him to reinvest his distributions into FG II.

II.  Discussion[1]

The United States alleges that Forbes' personal transfers and those from FG Enterprises, LLC, to Gallagi were intentionally fraudulent (Nineteenth Count) and constructively fraudulent (Twentieth Count), in violation of the FDCPA.

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.     Constructive Fraud (Twentieth Count)[2]

To establish Gallagi's liability for constructive fraudulent transfers under the FDCPA, the Government is required to show that the judgment–debtor, Forbes, "ma[de] the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation; [and] intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 28 U.S.C. § 3304(b)(1)(B)(ii). It is undisputed that Forbes made the transfers at issue to Gallagi and did so at a time when he "intended to incur or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." What the parties disagree on is whether there are material facts in dispute as to whether Forbes received reasonable equivalent value in exchange for these transfers.

First, Gallagi challenges the Government's valuations of the FG entities that Forbes transferred. He claims that the Summary of Investor Undistributed Investments that Evonsky prepared on August 17, 2001 was inaccurate and that because there was no valuation precisely at the time of the transfers, their value cannot be ascertained. However,

---

[2] Gallagi also raises "new value" and "ordinary course of business" defenses to the United States's constructive fraud claims, pursuant to 28 U.S.C. § 3307(f), which provides that

> [a] transfer is not voidable under section 3304(a)(2)—(1) to the extent the insider gives new value to or for the benefit of the debtor after the transfer is made unless the new value is secured by a valid lien;[or] (2) if made in the ordinary course of business or financial affairs.

These defenses only apply to Section 3304(a)(2), however, and Plaintiffs' constructive fraud claim is brought under Section 3304(b)(1)(B)(ii); therefore, neither defense applies to the constructive fraudulent transfer claims.

the August 2001 valuation of the FG entities was conducted four months before the effective transaction date for the transfers and pegged the value of the entities transferred personally from Forbes at $439,009 and of the entities transferred from FG Enterprises, LLC at $698.406.

Gallagi challenges these figures, claiming that Evonsky, who compiled the August 2001 valuation summary, later discredited it; that the September 11, 2001 terrorist attacks, in the period between the valuation and the transfers, profoundly affected the private equity markets; and that the values attributed to some FG entities in the summary "are totally inconsistent with what was realized (or not realized) by each interest by Mr. Gallagi years later." (Gallagi Mem. Opp'n [Doc. # 246] at 26.) Evonsky's deposition testimony did not "discredit" his summary as Gallagi suggests; rather, he clarified that for some of the FG entities, the stated current value in the August 2001 summary was based on the "the most recent third party transaction at whatever date that may have been preceding August 15, 2001." (Evonsky Dep. at 67:22–68:9.) Additionally, the basis for Gallagi's claim that the private–equity markets were impacted by the September 11 attacks was Evonsky's deposition statement that "[a]fter the terrorist[] attacks, I know that people were less willing to make investments in private equity just because there was a lot of uncertainty." (*Id.* at 61:13–16.) Defendant does not offer any quantifiable evidence as to how that generalized reluctance to invest in private equity would have impacted the value of Forbes' investments in the FG entities at the time of transfer. Their value when Forbes transferred them to Gallagi, four months after the valuation summary was compiled is not contradicted by any evidence from which a reasonable fact–finder could infer that the valuation summary was so significantly

inaccurate that the value of all of the FG entities could be said to have been equivalent, or even comparable to the two dollars Gallagi paid for them.

Gallagi also maintains that the transferred FG entities lacked value because they were "high risk" investments in private start-up companies, for which there was little available information for investors. However, the record is undisputed that the only risk borne by Gallagi was the two dollars he paid for the investments, i.e. even if they lost all of their value, he would only lose two dollars: "For me, the downside risk was a dollar for the group of investments in [the FG entities transferred from Forbes] and dollar for the group of investments in [the FG entities transferred from FG Enterprises, LLC]. So there was upside potential, not much downside potential or downside risk." (Gallagi Dep. at 65:5–9.) Thus, whether the FG entities were "high risk" has no bearing on their value to Gallagi in relation to what he was paying for them. Even though Gallagi notes that under the Agreements, he assumed all obligations required as a member of the companies in which the FG entities were invested, there is no evidence that Gallagi incurred any financial obligations as a result of the transfers.

Gallagi also maintains that because he contributed all but $100,000 of the cash he received in distributions from the FG entities to FG II, he did not receive the entire value the Government claims. It is patently obvious, however, that $100,000 is still an impressive financial return for Gallagi, on his two dollar investment. Additionally, it was Gallagi's choice to contribute the remaining $768,903 he received in cash distributions to FG II; he admitted during his deposition that neither Forbes nor the Agreements directed him to contribute any funds to FG II. As the Government notes, Gallagi could have chosen to invest that money in "Google, pork bellies, installation of an in-ground pool, or anything

7

else." (Pl.'s Reply to Gallagi [Doc. # 255] at 9–10.) Whether Gallagi kept or gave away the money he received in FG–entity distributions has no bearing on the amount of distributions he received.

Next, Gallagi argues that whether Forbes received value from the transfers remains in dispute, because Forbes was able to write–off losses from the transfers on his 2002 taxes.[3] However, Gallagi misconstrues both the Government's argument and the concept of "reasonably equivalent value" under the FDCPA. Under 28 U.S.C. § 3303(a), "[v]alue is *given* for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied" (emphasis added). Additionally, for purposes of Sections 3304,

> a person *gives* a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of such interest upon default under a mortgage, deed of trust, or security agreement.

28 U.S.C. § 3303(b) (emphasis added). Thus, to satisfy Section 3304(b), Gallagi must demonstrate both that Forbes received reasonably equivalent value and that Gallagi *gave* that value to him. Regardless of whether Forbes received value from the tax loss,[4] it is undisputed

---

[3] In *Cottage Savings Association v. Commission of Internal Revenue*, 499 U.S. 554 (1991), on which Gallagi relies for his proposition that "tax loss constitutes true value" for FDCPA purposes, the Supreme Court determined that under a rule promulgated by the Federal Home Loan Bank Board, swapping bundles of mortgages could constitute a realization event for tax purposes.

[4] The court cannot find any evidence in the summary–judgment record that Forbes actually *took* the tax loss from selling the FG entities; the $969,083 figure is drawn from Forbes's Capital Gains and Loss Balance Sheets for the year 2002 (Ex. F to Loc. R. 56(a)2 Stmt.), but there are no tax returns in the record, and while Forbes asserted in his deposition that he intended to write–off the losses, he did not say he actually did.

8

that Gallagi gave Forbes only a nominal amount as consideration. (Forbes Dep., Ex. D to Gallagi Loc. R. 56(a)(2) Stmt. at 112:3–7.) This consideration did not constitute reasonably equivalent value within the meaning of that term under Section 3303. *See, e.g.*, *United States v. Moore*, 156 F. Supp. 2d 238, 245 (D. Conn. 2001).

Gallagi points out that after the transfer, Forbes no longer needed to await the distribution of K–1s from each of the companies for which he sold interests to calculate his taxes. However, under the FDCPA "value" means "economic value," *see Moore*, 156 F. Supp.2d at 246 & n.2, so any benefit accruing to Forbes by not having to wait for distribution of K–1s is not "value" for purposes of the statute.

Because there are no facts on which a fact–finder could reasonably infer that Gallagi gave reasonably equivalent value in exchange for the FG entities, the United States's motion for summary judgment as to the Twentieth Count is granted.

B. Actual Fraud (Nineteenth Count)

In the Nineteenth Count, the United States claims that Forbes' transfers to Gallagi constitute actual fraud under 28 U.S.C. § 3304(b)(1)(A), in that they were made "with actual intent to hinder, delay or defraud a creditor." Section 3304(b)(2) lists "badges of fraud" to be considered in determining whether Defendant's transfers were motivated by actual fraudulent intent:

    (A)    the transfer or obligation was to an insider;

    (B)    the debtor retained possession or control of the property transferred after the transfer;

    (C)    the transfer or obligation was disclosed or concealed;

    (D)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(E) the transfer was of substantially all the debtor's assets;

(F) the debtor absconded;

(G) the debtor removed or concealed assets;

(H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

"Because direct evidence of fraud is often lacking the badges of fraud allow the fact finder to infer fraudulent intent from other proven facts." *Cadle Co. v. White*, No. 3:03cv30(TPS), 2006 WL 798900, *6 (D. Conn. Mar. 21, 2006) (analyzing Connecticut state analog to FDCPA). However, the existence of some badges of fraud does not mandate the conclusion that actual fraudulent intent motivated the transfers. For instance, in *Moore*, 156 F. Supp. 2d at 244–45, a restitution debtor transferred to his spouse his interest in real property that he was required to use to satisfy a restitution obligation, under circumstances including lack of reasonably equivalent value, transfer to an insider, concealed transfer, and transfer made shortly before the property became a term of Defendant's plea agreement. However, Judge Underhill denied summary judgment because material issues remained in dispute about the defendant's claimed legitimate, non–fraudulent purpose for the transfer, specifically giving his wife the ability to sell the home if she could not meet the mortgage

obligations and to facilitate her daily operation and maintenance of the property while he was incarcerated.

The circumstances of Forbes' transfers of the FG entities to Gallagi demonstrate the existence of several badges of fraud. Gallagi does not dispute that his relationship with Forbes was tantamount to being an "insider," given that they were both members of FG II, a closely–owned LLC. Nor does Gallagi dispute that at the time of the FG–entity transfers, Forbes had already been sued by shareholders, was in danger of a contribution suit by Cendant, was subject to an SEC investigation, and was the target of a Department of Justice criminal prosecution. In addition, as discussed above, Forbes did not receive reasonably equivalent value in exchange for the FG entities. The United States also urges as evidence of Forbes' fraudulent intent the "taint" from his transfer of properties in Connecticut, Florida, and Colorado in 1998 and 1999, which he admitted were made to shield them from shareholder suits. In 1998, Forbes also transferred $14 million to accounts in his wife's name, and in 2000, he transferred an additional $4.4 million to her.

However, the absence of additional badges undermines the existence of actual fraudulent intent. Forbes did not retain control over the FG entities after the transfer. He did not conceal the transfers or transfer his ownership in FG investments vehicles in their entirety; as of December 31, 2003, Forbes and FG Enterprises, LLC retained partnership interests valued at $911,016 and $1,462,270 respectively. Additionally, while the circumstances surrounding the transfers may present indicia of fraudulent intent, like the restitution debtor in *Moore*, Gallagi provides a non–fraudulent rationale for Forbes' transfers of the FG entities to him, namely: Forbes wanted to write off the tax loss from the transfers. Forbes explained in his deposition that he would occasionally transfer "potentially

worthless" investment interests for nominal sums, to take the tax loss. Evonsky testified that in his experience in the private equity industry, he dealt with other investors "at least a few times" who sold their interests in companies they invested in with FG II to "just take the loss on the investments" for tax purposes, as opposed to holding onto the investments that may never realize a gain. (Evonsky Dep. at 35:15–36:20.) Indeed, while Forbes admitted that he effectuated other transfers—namely property transfers to his family—with fraudulent intent, he maintained that he transferred the FG entities for tax purposes only.

The Government dismisses Forbes' stated tax–related motivation for transferring the FG entities, noting that Forbes' financial position deteriorated by the time the transfers were made, he had no appreciable income, and his liabilities were mounting, and reasoning that therefore, he needed cash distributions from the investments more than a tax write–off. However, according to a "statement of financial condition" prepared by accountants at Buck Sturmer & Co., P.C., Forbes' net worth as of December 31, 2003 was $17,252,035, and he maintained partnership interests in FG entities through FG Enterprises, LLC worth $2,373,286. (Ex. Y–5 to Loc. R. 56(a)1 Stmt. at 56–62.) Additionally, according to that statement, as of December 31, 2003, Forbes had estimated federal and state tax liabilities for 2003 totaling $30,000, which reflected "estimated 2003 individual income tax payments made with extensions in April of 2004 . . . represent[ing] half of the amounts paid with joint extensions." (*Id.* at 63.) Whether Forbes tried or was able to derive any tax benefits from the FG–entity transfers remains unclear, Forbes' stated purpose for making the transfers for tax purposes, considered in the context of his previously having made such transfers for tax purposes, Evonsky's recognition that other private equity investors engage in such transactions, and the fact that Forbes retained significant net worth and partnership interests

in cash-distributing assets from which he may have generated income, a fact–finder could reasonably infer that Forbes transferred the FG entities for non–fraudulent reasons.

Therefore, Plaintiff's motion for summary judgment on the Nineteenth Count, for actual fraud, is denied. However, because there are no remaining facts in dispute as to whether Gallagi engaged in constructive fraud with Forbes, the United States is still entitled to avoidance of the transfer. *See* 28 U.S.C. § 3306(a).

IV. Conclusion

For these reasons, the United States's Motion for Summary Judgment [Doc. # 238] is DENIED as to the Nineteenth Count but GRANTED as to the Twentieth Count, and Forbes' transfer to Gallagi of the FG entities is hereby voided, and those entities remain the property of Forbes.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of September, 2010.