UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| United States of America, et al., | |
|---|---|
| *Plaintiff*, | Civil No. 3:08cv933 (JBA) |
| v. | |
| Walter A. Forbes, et al., | September 30, 2010 |
| *Defendant*. | |

RULING ON MOTION FOR SUMMARY JUDGMENT - FREIMOUR

In this case, whose procedural background is described in the Court's ruling on the United States' summary judgment motion against codefendant Frank Gallagi [Doc. # 264], the United States moves for summary judgment against Beth Freimour, to recover the value of transfers it claims were constructively and intentionally fraudulent in violation of the Federal Debt Collection Procedure Act ("FDCPA").

I.  Factual Background

Defendant Beth Freimour was Walter Forbes' assistant at Cendant and left Cendant in July 1998 to join him at FG II in the same capacity. (Freimour Dep., Ex. O to U.S. Loc. R. 56(a)1 Stmt. [Doc. # 238-2] at 15:4–19:16.)  Ms. Freimour worked at FG II from August 1998 to December 2007. (*Id.*)  She had no employment contract with FG II (*id.* at 17:6-8), and FG II did not offer its employees an insurance plan for legal services (Gallagi Dep., Ex. P to U.S. 56(a)1 Stmt. at 129:22–25).  Ms. Freimour was served with subpoenas during the criminal investigation of Mr. Forbes and was subsequently involved in his three criminal trials.  (April 14, 2009 Letter from Michael Jones, Ex. R to U.S. 56(a)2 Stmt.)  On Mr. Forbes' advice, she retained the law firm of Arent

Fox Kintner Plotkin & Kahn to represent her in connection with the investigation and litigation and paid Arent Fox a total of $107,081.84 between 2000 and 2006. (*Id.*)

At the time Ms. Freimour engaged Arent Fox, Mr. Forbes assured her that she would be reimbursed for her legal expenses, which she was (*Id.*; Freimour Dep., Ex. O to U.S. 56(a)1 Stmt. at 129:19-130:11.) Ms. Freimour did not recall who supplied the funds for the reimbursements, but assumed that the reimbursements came from FG II. (Freimour Dep., Ex. B to Freimour Loc. R. 56(a)2 Stmt. [Doc. # 248] at 50:3–51:15.) Mr. Forbes, however, stated in his February 4, 2009 deposition in this matter that he personally reimbursed Ms. Freimour for her legal expenses (Forbes Dep., Ex. C to U.S. 56(a)1 Stmt. at 123:15–20), and individual checks from his personal bank account made out to Ms. Freimour and signed by Mr. Forbes parallel the amounts of sixteen of the twenty-seven payments Ms. Freimour made to Arent Fox (U.S. Reply re: Freimour Exs. D, D to Freimour [Doc. # 254]) Rodd Evonsky, FG II's controller, did not recall FG II paying legal fees for Ms. Freimour or reimbursing Ms. Freimour for her legal expenses. (Evonsky Dep., Ex. Q to U.S. 56(a)(1) Stmt. at 114:5-15.)

II.   Discussion

    A.   Statute of Limitations

Ms. Freimour argues that the limitations period in 28 U.S.C. § 3306(b) time–bars (1) any constructive fraudulent transfer claims under 28 U.S.C. § 3304(b)(1)(B) that concern transfers occurring more than six years prior to February 12, 2009, when she was made a party to this action; and (2) any intentional fraudulent transfer claims under § 3304(b)(1)(A) that occurred more than two years prior to the January 17, 2007 Restitution Order. (Freimour Opp'n [Doc. # 247] at 5-6.)

The United States counters that its claims are timely because intentional fraudulent transfer claims must be brought within either the six- or two- year limitations period, the statute of limitations stopped running on December 1, 2008 when Plaintiffs filed their Motion for Leave to file an Amended Complaint, and, in any event, the statute of limitations was tolled with respect to the intentional fraudulent transfer claims until the issuance of the Restitution Order on January 17, 2007.[1] (Reply re: Freimour 2-3.)

The Court agrees that the statute of limitations was tolled until January 17, 2007, the date on which the Restitution Order was issued, with respect to the intentional fraudulent transfer claims and concludes that those claims are timely as falling within the two year statutory period ending January 17, 2009.[2] First, the statute of limitations stopped running on the intentional and constructive fraudulent transfer claims on December 1, 2008. "When a plaintiff seeks to add a new

---

[1] The United States asks this Court to equitably toll only the two year statute of limitations for intentional fraudulent transfer claims under 28 U.S.C. § 3304(b)(1)(A) requiring that a claim for relief under that section be brought "within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant" § 3306(b)(1). With respect to the United States's constructive fraudulent transfer claims under 28 U.S.C. § 3304(b)(1)(B), it concedes that two of the transfers to Ms. Freimour fall outside the 6 year statute of limitations and only seeks a money judgment of $96,831.76 with respect to Count Twenty Four of the Third Amended Joint Complaint, rather than the full $107,081.84 transferred to Ms. Freimour from 2000 to 2006. (Mot. for Summ. J. [Doc. # 238] at 33.) Accordingly, the Court will only analyze equitable tolling as it applies to the intentional fraudulent transfer claim and will apply the 6 year statute of limitations to the constructive fraudulent transfer claims.

[2] Although the Court agrees with the United States that a plaintiff must bring intentional fraudulent transfer claims either "within 6 years after the transfer was made" *or* if a transfer falls outside that 6-year period, then "within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant," 28 U.S.C. § 3306(b)(1), the 6 year period is of no consequence here because, as discussed below, the 2 year period was equitably tolled, and all intentional fraudulent transfers claims are therefore timely. Accordingly, the Court will not engage in further analysis of the applicability of the 6 year statutory period to the intentional fraudulent transfer claims.

3

defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for the statute of limitations purposes." *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) (internal citations omitted). Plaintiffs moved to amend their complaint to add Ms. Freimour as a defendant on December 1, 2008, (*see* Am. Joint Compl., Ex. A to Mot. Leave Amend [Doc. # 103] at 2) and therefore the United States commenced its action against Ms. Freimour, and the statutory period stopped running, on that date.

Second, the statutory period for the intentional fraudulent transfer claims was equitably tolled and did not begin running until January 17, 2007. The United States timely brought those claims against Ms. Freimour within two years of that date, i.e., on December 1, 2008. The FDCPA provides that an intentional fraudulent transfer claim, if not brought "within 6 years after the transfer was made or the obligation was incurred," must be brought "within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant." 28 U.S.C. § 3306(b)(1). This two–year limitations period is subject to the principle of equitable tolling, a doctrine whereby the limitations period can be tolled, or stopped from running, during a time period in which the plaintiffs are prevented from enforcing or are unable to enforce their rights. *See Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) ("Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances. This Court has applied the doctrine as a matter of fairness where a plaintiff has been prevented in some extraordinary way from exercising his rights.").

"A litigant seeking equitable tolling bears the burden of establishing that (1) it has pursued its rights diligently and (2) some extraordinary circumstance stood in its way." *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 730 (S.D.N.Y. 2007) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Although "[e]quitable tolling applies only in the rare and exceptional circumstance," *Smith*

4

*v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000), the Supreme Court has held that "unless tolling would be inconsistent with the text of the relevant statute," a limitations period is subject to equitable tolling during a period in which a plaintiff is legally incapable of bringing his or her claim. *Young v. United States*, 535 U.S. 43, 49-50 (2002)

Here, the United States lacked the legal ability to bring its fraudulent transfer claims against Ms. Freimour prior to the issuance of the January 17, 2007 Restitution Order. The FDCPA defines a "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured." 28 U.S.C. § 3301(3). Before entry of the Restitution Order in the amount of $3.275 billion, the United States had no "right to payment" of any the funds fraudulently transferred by Walter Forbes and accordingly had no legal "claim" under the FDCPA. As recognized in *Young*, it would be inequitable to apply to the United States' claim the period of time in which it was legally unable to bring that claim. 535 U.S. at 50 (the three–year limitation period for the IRS's action against the Youngs to collect unpaid taxes was properly tolled during the pendency of the Youngs' bankruptcy petitions, because the government was legally precluded from collecting the tax debts while those petitions were pending, *see also* e.g., *Parmalat*, 493 F. Supp. 2d at 731-32 (equitably tolling the limitations period where plaintiffs were enjoined from bringing their claims as the result of a preliminary injunction in a separate proceeding). The "period of disability," i.e. the time prior to the Restitution Order and hence any action to enforce it, therefore equitably tolled the limitations period. *Id.*

This tolling is not inconsistent with the FDCPA. "Congress must be presumed to draft limitations periods in light of [the] background principle" that equitable tolling will apply in the absence of inconsistent statutory text. *Id.* at 49. The FDCPA includes no statutory text suggesting

5

a limitations period at odds with equitable tolling, and in fact it contains a clear command that it "shall not be construed to curtail or limit the right of the United States . . . to collect any fine, penalty, assessment, restitution, or forfeiture arising in a criminal case." 28 U.S.C. § 3003(b). With this directive in mind, it would be antithetical to conclude that the equitable tolling of the intentional fraudulent transfer claim limitations period prior to the issuance of a restitution order is inconsistent with the text of the FDCPA.

The Court accordingly finds that the 2–year limitations period under 28 U.S.C. § 3306(b)(1) for intentional fraudulent transfer claims by the United States was equitably tolled until issuance of the January 17, 2007 Restitution Order. The period stopped running upon Plaintiffs' December 1, 2008 Motion for Leave to Amend Joint Complaint, thus the United States' intentional fraudulent transfer claims against Ms. Freimour fall within the statutory period and are not time barred.

B. Summary Judgment[3]

1. The Source of the Funds

Ms. Freimour argues that genuine issues of material fact remain as to whether Forbes was the source of the reimbursements she received for legal expenses. According to Ms. Freimour, her deposition testimony that FG II, rather than Forbes, reimbursed her, creates a material factual dispute that must be decided by a fact finder who will "decide which witness is more credible or what evidence is more weighty." (Freimour Opp'n at 6-7.) The United States maintains that Ms. Freimour's unsupported belief that the funds came from FG II, in the face of evidence that the funds

---

[3] The Court will apply the familiar summary–judgment standard without recitation in detail. *See* Fed. R. Civ. P. 56(c)(2); *see also, e.g., Davis v. City of Hartford*, 601 F. Supp. 2d 488, 491 (D. Conn. 2009) (reciting standard).

came from Mr. Forbes, does not create an issue of material fact. (Reply re: Freimour at 7.) The Court agrees.

Where a party moving for summary judgment has carried its burden and "has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts . . . or on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party must be able to cite to "particular parts of materials in the record" in order to support a claim that a fact is genuinely disputed. Fed. R. Civ. P. 56(c); *see Aslandis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) ("Once this burden is met, the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists."). Such a claim must rely on "more than a 'scintilla of evidence,'" *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)), and bald assertions or conclusory allegations do not create a genuine issue of material fact *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Del. & Hudson*, 902 F.2d at 178. If the nonmoving party cannot come forward with sufficient evidence to demonstrate a genuine issue of material fact and "the record taken as a whole could not lead a rational trier of fact to find for the non–moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citations and internal quotation marks omitted).

The United States has "established a *prima facie* case demonstrating the absence of a genuine issue of material fact," *Bryant*, 923 F.2d at 982, regarding Mr. Forbes' identity as the sole source of the reimbursement for Ms. Freimour's legal fees. Mr. Forbes testified that he made loans to Ms. Freimour "[t]o help her pay for her attorney's fees." (Forbes Dep., Ex. C to U.S. Rule 56(a)1 Stmt.

at 123:15–20). Corroborating Mr. Forbes' statement that he personally provided the fee reimbursement, the United States has produced copies of checks for sixteen of the twenty seven transfers to Ms. Freimour, which are signed by Mr. Forbes and were drawn from his personal account. The United States further points to Mr. Forbes' tax returns for 2003 through 2006, on which he declared $99,996.00 in total gifts to Ms. Freimour over that period (Ex. D to Reply re: Freimour), an amount roughly comparable to the total amount of legal fees, $96,832.60, Ms. Freimour paid during that time (Ex. R to U.S. 56(a)(1) Stmt.). In addition, a December 2005 memorandum between two of Mr. Forbes' accountants declares that "Beth has had some loans from Walter for her legal fees that I believe we are carrying as a receivable of $25,000," (Ex. B to Reply re: Freimour), and during his criminal case, Mr. Forbes submitted a declaration that lists as an illiquid asset "Receivable from Beth Freimour" (Ex. C to Reply re: Freimour).

Ms. Freimour acknowledged in her deposition testimony that she was reimbursed for her legal expenses. (Freimour Dep., Ex. O to U.S. 56(a)1 Stmt. at 129:19–130:18.)[4] Arent Fox invoices

---

[4] Ms. Freimour's deposition reads:

Q: I take it then it's Mr. Forbes that said to you, "Beth, don't worry, I'll pay for your legal fees"? Is that a fair summary?
A: I don't know if he specifically said he would. He did tell me it would be reimbursed to me. I had never had a lawyer before. I was a regular person. I didn't know where to go or what to do. I asked Walter who had put me in touch with his attorney and said not to worry about it.
Q: But all you cared about was that it was going to cost you money to have a lawyer?
A: Correct.
Q: And —
A: I support myself, so.
Q: Mr. Forbes said, "Don't worry, either I will reimburse you or" —
A: "Or you'll be reimbursed." I don't remember the exact language.
Q: I see you produced the bills from Arent Fox. What mechanically did you do? You got a bill from Arent Fox, what did you do? Did you pay it or take it into Mr. Forbes and say, "Pay this bill"?

and Ms. Freimour's bank statements show that Ms. Freimour paid, and was reimbursed for, $107,081.24 in legal fees between November 21, 2000 and November 13, 2006. (Ex. R to Reply re: Freimour) Ms. Freimour does not dispute that she received reimbursement for all of these legal expenses (Freimour Dep., Ex. O to U.S. 56(a)(1) Stmt. at 138:9-18), only that she "assumed" the reimbursement came from FG II, and not Mr. Forbes. (Ex. A to Reply re: Freimour Dep. 50:6-11.)[5]

---

A: I paid it and then I was reimbursed the money.
Q: Mechanically how did you get reimbursed?
A: I received a check but — I received a check.

(*Id.*)

[5]Ms. Freimour testified to the identity of the reimburser as follows:

Q: The money that you received for your attorney's fees, as I think you are aware, is at issue in this litigation.
A: Yes.
Q: Who handed you that money?
A: I don't recall. I know I was reimbursed for it and that was pretty much all that mattered to me but I don't recall the method.
Q: Did you get that money by check, direct deposit, cash, or some other method.
A: I would say by check.
Q: You don't recall who handed you the check?
A: No. I imagine it was the company — I don't know if it was Rod that gave it to me — I don't recall.
Q: When you say the company, what company do you mean?
A: FG — well, first CUC and then FG II.
Q: Who gave you the money for your legal expenses?
A: I did. I paid for them.
Q: Let me rephrase the question. Who gave you the money that was reimbursed to you for your legal expenses?
A: I assumed it was coming from the company.
Q: By the company you mean FG II Ventures?
A: Yes.

(*Id.* 49:11–50:11.)

This assumption is precisely the "conjecture" that cannot defeat a motion for summary judgment in the face of a *prima facie* showing that there is no genuine issue of material fact. *See Bryant*, 923 F.2d at 982. Although Ms. Freimour cites to her own deposition testimony to support her claim of a genuine issue of fact that deposition testimony itself is nothing but an expression of "metaphysical doubt." It is a mere "scintilla of evidence," an assumptive rumination that falls even below the level of conclusory allegation. *See Carey v. Crescenzi*, 923 F.2d at 21; *Del. & Hudson*, 902 F.2d at 178. The record taken as a whole demonstrates that only Mr. Forbes personally reimbursed Ms. Freimour for her legal expenses shows. That Ms. Freimour assumed at the time of the reimbursements that they came from FG II would not provide a basis for a rational trier of fact to find that Mr. Forbes did not reimburse her expenditures. There is accordingly no genuine issue for trial as to the source of the reimbursements.

2. Constructive Fraudulent Transfers

A constructive fraudulent transfer under the FDCPA is a transfer by a debtor "whether such debt arises before or after the transfer is made," that is made "without receiving a reasonably equivalent value in exchange for the transfer . . . if the debtor . . . intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 28 U.S.C. § 3304(b). The FDCPA defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." § 3301(6). Under the statute, "a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of such interest upon default under a mortgage, deed of trust, or security agreement." § 3303(b). The term "value"

connotes only economic value, and "any intangible, emotional benefit is not included within the meaning of reasonable equivalent value." *United States v. Moore*, 156 F. Supp. 2d 238, 246 n.2 (D. Conn. 2001).

Mr. Forbes owes a debt to the United States by virtue of the January 17, 2007 Restitution Order.[6] The record conclusively demonstrates that Mr. Forbes did, in fact, reimburse Ms. Freimour for her legal expenses (*see* discussion, *supra*), and as direct payments of money for the purposes of the FDCPA, these reimbursements are "transfers." *See* 28 U.S.C. § 3301(6).[7] Mr. Forbes did not receive reasonably equivalent value in exchange for reimbursing Ms. Freimour. In their depositions, neither Mr. Forbes nor Ms. Freimour testified that Mr. Forbes received any economic value in return for the reimbursements. (*See* Forbes Dep. at 123:15–124:25; Freimour Dep., Ex. O at 129:19–131:18, 138:9-18.) Without an exchange of economic value, any chivalrous, charitable, or philanthropic benefit to Mr. Forbes is not reasonably equivalent value. *See Moore*, 156 F. Supp. 2d at 246 n.2. Lastly, Mr. Forbes engaged in the transfers with Ms. Freimour at a time when he "believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." § 3304(b). [8]

---

[6] The FDCPA includes within its definition of debt: "an amount that is owing to the United States on account of . . . restitution." 28 U.S.C. § 3002(3)(B).

[7] Under the explicit terms of the statute, that the Restitution Order entered after the transfers is of no consequence. *See* § 3304(b)(1).

[8] During the period in which Forbes reimbursed Ms. Freimour for her legal expenses, he had been sued by Cendant shareholders, knew that Cendant would likely seek contribution from him following its settlement with shareholders, and was the subject of SEC and Department of Justice investigations.

Because there is no evidence on which a reasonable fact-finder could find that Forbes' reimbursement of Ms. Freimour's legal expenses does not satisfy the standard for constructive fraudulent transfers under the FDCPA, the United States is entitled to summary judgment with respect to Count Twenty Four of the Third Amended Joint Complaint in the amount of $96,831.76.[9]

### 3. Intentional Fraudulent Transfers

The United States also moves for summary judgment against Ms. Freimour on Count Twenty-Three of the Third Amended Joint Complaint, which claims that Mr. Forbes made the transfers to Ms. Freimour "with actual intent to hinder, delay, or defraud a creditor." *See* 28 U.S.C. § 3304(b)(1)(A). In the absence of direct proof of intent to defraud, the Court may consider as "badges" of fraudulent intent the following factors:

(A) the transfer or obligation was to an insider;
(B) the debtor retained possession or control of the property transferred after the transfer;
(C) the transfer or obligation was disclosed or concealed;
(D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(E) the transfer was of substantially all the debtor's assets;
(F) the debtor absconded;
(G) the debtor removed or concealed assets;
(H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

---

[9] This amount represents the value of transfers made after December 1, 2002. As the United States concedes, any constructive fraudulent transfer claims for transfers made before that time are barred by the 6-year statute of limitations under 28 U.S.C. § 3306(b)(1). *See* Footnote 1, *supra*.

28 U.S.C. § 3304(b)(2).

The United States concedes that "Mr. Forbes engaged in the transfers to M[s]. Freimour for the purpose of reimbursing her for the legal fees that she had incurred due to his transgressions," but argues that "the potentially chivalrous motive for the transfer does not make it any less fraudulent." (Mot. Summ. J. at 28.) The Court agrees that chivalrous intent does not necessarily preclude the fraudulent nature of a transfer, *see Moore*, 156 F. Supp. 2d at 246 n.2. However, if a transfer is made with chivalrous intent but without actual fraudulent intent, even though it may constitute a constructive fraudulent transfer, it cannot be an intentionally fraudulent transfer. Given Mr. Forbes' explanation that he transferred funds to Ms. Freimour in order to reimburse her for legal fees necessitated by the spillover of his legal troubles, the United States' concession to that effect, and the relatively limited existence of "badges" of fraud[10], a reasonable jury could find that Mr. Forbes did not act "with actual intent to hinder, delay, or defraud" creditors by reimbursing Ms. Freimour for her legal fees.

Mr. Forbes' reimbursement of Ms. Freimour's legal expenses does display several of the badges of fraudulent intent. Mr. Forbes transferred the funds to Ms. Freimour at a time when he had been sued by Cendant shareholders, knew that Cendant would likely seek contribution from him following its settlement with shareholders, and was the subject of SEC and Department of Justice investigations. *See* 28 U.S.C. § 3304(b)(2)(D). Although Forbes did not transfer even close to all of his assets to Ms. Freimour, these reimbursements coincided with a pattern of Forbes transferring substantially all of his assets. *See* § 3304(b)(2)(E). Also, as discussed in the Court's

---

[10]Where the debtor is an individual, the FDCPA defines "insider" as "(i) a relative of the debtor or of a general partner of the debtor; (ii) a partnership in which the debtor is a general partner; (iii) a general partner in a partnership described in clause (ii); or (iv) a corporation of which the debtor is a director, officer, or person in control." 28 U.S.C. § 3301(5).

analysis of constructive fraud, Forbes did not receive reasonably equivalent value for the reimbursements and made the transfers to Ms. Freimour at a time when he was incurring significant debts. *See* §§ 3304(b)(2)(H), (I). However, Ms. Freimour was not an insider, Mr. Forbes did not retain any control over the funds he transferred to Ms. Freimour, and there is no evidence that Forbes concealed the reimbursements.

As in *Moore*, this Court is "not prepared to say, as a matter of law," that the presence of some badges of fraud, in the face of a reasonable, and uncontroverted, statement of non-fraudulent intent, is enough to show that Forbes acted "with actual intent to hinder, delay, or defraud a creditor." 156 F. Supp. 2d at 245. The circumstances surrounding the transfer (the mounting suits against Forbes, the pattern of transfers, the lack of equivalent value, and Forbes' significant debt) meet the statutory standard for constructive fraud, but do not go far enough to negate the evidence of Forbes' stated intent to help Ms. Freimour or require the conclusion that Forbes actually intended to defraud his creditors by helping Ms. Freimour.

Accordingly, the United States is not entitled to summary judgment with respect to Count Twenty–Three of the Third Amended Joint Complaint.

III.  Conclusion

For the reasons stated above, the United States's Motion for Summary Judgment [Doc. #238] is DENIED as to the Twenty Third Count but GRANTED as to the Twenty Fourth Count, in the amount of $96,831.76, the value of the funds Forbes transferred to Freimour after December 1, 2002.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of September, 2010.